ACCEPTED
03-15-00370-CV
7086471
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/24/2015 3:14:24 PM
JEFFREY D. KYLE
CLERK

NO. 03-15-00370-CV

_____

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
TRAVIS COUNTY, AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/24/2015 3:14:24 PM
JEFFREY D. KYLE
Clerk

_____

REAGAN NATIONAL ADVERTISING OF AUSTIN, INC., APPELLANT

VS.

THE CITY OF AUSTIN AND MARC A. OTT, IN HIS OFFICIAL CAPACITY,
APPELLEES

_____

ON APPEAL FROM
THE 200th JUDICIAL DISTRICT COURT
TRAVIS COUNTY, TEXAS
CAUSE NO. D-1-GN-12-001211

_____

APPELLANT'S BRIEF

_____

B. Russell Horton
State Bar No. 10014450
rhorton@gbkh.com
George Brothers Kincaid & Horton, L.L.P.
114 West 7th Street, Suite 1100
Austin, Texas 78701
(512) 495-1400
(512) 499-0094 FACSIMILE
ATTORNEY FOR APPELLANT

_____

ORAL ARGUMENT IS REQUESTED

_____

# IDENTITY OF PARTIES AND COUNSEL

1. Appellant: Reagan National Advertising of Austin, Inc.

2. Appellee: City of Austin and Marc A. Ott, in his official capacity

3. Trial counsel for Appellant: B. Russell Horton
   Taline Manassian
   George Brothers Kincaid & Horton, L.L.P.
   114 West 7th Street, Suite 1100
   Austin, TX 78701

4. Trial counsel for Appellees: Patricia Link
   Gray Laird
   City of Austin Law Department
   PO Box 1546
   Austin, TX 78767

5. Counsel on appeal for Appellant: B. Russell Horton
   George Brothers Kincaid & Horton, L.L.P.
   114 West 7th Street, Suite 1100
   Austin, TX 78701

6. Counsel on appeal for Appellees: Patricia Link
   Gray Laird
   City of Austin Law Department
   PO Box 1546
   Austin, TX 78767

i

# TABLE OF CONTENTS

**PAGE**

IDENTITY OF PARTIES AND COUNSEL ........................................................... i

TABLE OF CONTENTS ..................................................................................... ii

INDEX OF AUTHORITIES ................................................................................vi

STATEMENT OF THE CASE ..............................................................................2

STATEMENT REGARDING ORAL ARGUMENT ...............................................3

ISSUES PRESENTED.........................................................................................4

STATEMENT OF FACTS ...................................................................................5

    1.   The Evolution of the City's Billboard Registration Program and Fee ........5

    2.   Reagan's Billboard Registration Fee Payments to the City.........................7

    3.   The City's Analysis of the Cost of the Billboard Registration Program ..................................................................................................7

    4.   Reagan's Analysis of the Cost of the Billboard Registration Program........................................................................................................12

    5.   The Trial Court's Ruling and Findings of Fact and Conclusions of Law ..................................................................................13

    6.   Background Relevant to the Issues of Res Judicata and Limitations .........................................................................................14

SUMMARY OF THE ARGUMENT ...................................................................17

ARGUMENT .....................................................................................................21

    I.   STANDARD OF REVIEW.........................................................................21

II. Issue No.1: The trial court erred in finding that res judicata did not apply and entering findings and conclusions that conflicted with the findings and conclusions of a federal judge entered after a full trial on a stipulated record ............................................ 21

III. Issue No. 2: The trial court erred in concluding that the City's billboard registration fee was a fee, rather than a tax, given the arbitrary near doubling of the fee, the absence of any assessment of costs until after the fee was increased, and the unreliable and imprecise assessment of costs performed by the City's expert ...................................................................................... 25

    A. Under Texas law, a municipality cannot impose an occupation tax on a particular industry if the State of Texas has not imposed an occupation tax ........................................... 25

    B. To determine whether the fee is a permissible fee or an unconstitutional tax, the trial court was required to consider whether the purpose of the fee was regulation or revenue and whether the fee was more than reasonably necessary to cover the cost of regulation ............................................ 27

    C. This appeal challenges the trial court's Additional Findings of Fact and Conclusions of Law related to the issue of whether the billboard registration fee is a fee ....................... 28

        1. The City did no assessment of its costs prior to raising the fee, and, before any lawsuit was filed, the City acknowledged that its increased fee was approximately $60 too high .......................................... 30

        2. Early attempts to justify the fee included actions and programs beyond those authorized by the enacting ordinance ................................................................. 30

        3. In litigation, the City's retained expert's analysis was based on imprecise and arbitrary estimates and looked at the City's program as implemented, rather than as authorized by the 2008 ordinance ................................. 31

iii

4. The evidence is insufficient to support the trial court's Additional Findings of Fact and Conclusions of Law related to the issue of whether the billboard registration fee.................................................................33

D. Case law on the assessment of a municipal fee gives the City discretion, but does not and should not allow for arbitrary fee increases and unsubstantiated after-the fact justifications ................................................................35

E. The trial judge in this case deferred to the City's exercise of its discretion more than the evidence warranted ............................39

IV. ISSUE NO. 3: Because Reagan filed this case within 60 days of the dismissal of the Federal Action becoming final, the trial court erred as a matter of law in concluding that Reagan's claims for fees paid for 2009 and 2010 are time barred ..............................41

A. Section 16.064 of the Texas Civil Practice & Remedies Code and case law show Reagan was timely because it filed the second lawsuit without 60 days of the federal court losing its power to alter its judgment.........................................41

B. The City's restrictive reading of Section 16.064 is inconsistent with Texas law ...........................................................43

C. The trial judge initially rejected the City's limitations argument, but he subsequently entered a conclusion of law on the issue that was inconsistent with his stated intended ruling ................................................................44

V. ISSUE NO. 4: Alternatively, the trial court erred in failing to order that Reagan was entitled, at a minimum, to a return of the amounts it paid in excess of $190 for the four years that the City charged a fee of $200 and in failing to grant attorneys' fees ................................................................45

PRAYER ................................................................47

CERTIFICATE OF COMPLIANCE................................................................48

CERTIFICATE OF SERVICE ...................................................................................48

# APPENDIX

APPENDIX A:         Final Judgment (dated March 31, 2015) (CR 508)

APPENDIX B:         Amended Findings of Fact and Conclusions of Law
(dated May 27, 2015) (CR 561-565)

APPENDIX C:         Tax Injunction Act (28 U.S.C. § 1341)

APPENDIX D:         Texas Constitution, art. VIII, § 1

APPENDIX E:         Texas Civil Practice & Remedies Code §16.064

APPENDIX F:         Austin City Ordinance No. 20080605-076 ("2008 Ordinance")
(Plaintiff's Exhibit 2)

APPENDIX G:         Austin City Ordinance No. 20120405-007
(portion of Defendants' Exhibit 2)

APPENDIX H:         Austin City Code § 25-10-152 (Nonconforming signs)

APPENDIX I:         November 9, 2009 email from Robert Rowan
(Plaintiff's Exhibit 8)

APPENDIX J:         Whitaker's Billboard Registration Fee Study
(without its attachments) (Defendants' Exhibit 10)

# INDEX OF AUTHORITIES

**CASES**                                                                                                          **PAGE**

*Barr v. Resolution Trust Corp.*, 837 S.W.2d 627 (Tex. 1992) ................................24

*Black v. City of Killeen*,
78 S.W.3d 686 (Tex. App.—Austin 2002, pet. denied) ........................................21

*Butler v. Continental Airlines, Inc.*,
116 S.W.3d 286 (Tex. App.—Houston 2003, pet. denied) ....................................23

*Chacon v. Andrews Distributing Co. Ltd.*,
295 S.W.3d 715 (Tex. App.—Corpus Christi 2009, pet. denied) ...........................42

*Citizens Ins. v. Daccach*, 217 S.W.3d 430 (Tex. 2007)..............................................22

*City of Brookside Village v. Comeau*, 633 S.W.2d 790 (Tex. 1982).......................27

*City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802 (Tex. 1984)..........28

*City of Fort Worth v. Gulf Refining Co.*, 83 S.W.2d 610 (Tex. 1935) ..............12, 27

*City of Houston v. Harris County Outdoor Advertising Assoc.*,
879 S.W.2d 322 (Tex. App. – Houston [14th Dist.] 1994, writ denied),
*cert. denied*, 516 U.S. 822 (1995)...................................... 24, 26, 27, 35, 36, 39, 46

*Hill v.* Kemp, 478 F.3d 1236 (10th Cir. 2007)...........................................................24

*Hoefling v. City of San Antonio*, 20 S.W. 85 (Tex. 1892) ......................................26

*Hurt v. Cooper*, 110 S.W.2d 896 (Tex. 1937) ........................................................27

*Igal v. Brightstar Info. Tech.*, 250 S.W.3d 78 (Tex. 2008)....................................22

*McKesson Corp. v. Division of Alcohol Beverages and Tobacco,
Dept. of Business Regulation of Florida, 496 U.S. 18 (1990)*..............................26

*Oscar Renda Contracting, Inc. v. H&S Supply Co., Inc.*,
195 S.W.3d 772 (Tex. App.—Waco 2006, pet. denied).....................................42, 43

*Pierce v. City of Stephenville*, 206 S.W.2d 848,
(Tex. Civ. App. – Eastland 1947, no writ)..........................................................26

*Quick v. City of Austin*, 7 S.W.3d 109 (Tex. 2004) ...........................................21

*Ruiz v. Austin Indep. Sch. Dist.*,
2004 WL 1171666 (Tex. App.—Austin 2004, no pet.)...................................43, 44

*Smith v. Travis County Educ. Dist.*, 791 F. Supp. 1170 (W.D. Tex.),
*vacated on other grounds*, 968 F.2d 453 (5th Cir. 1992) ...........................................26

*Vale v. Ryan*, 809 S.W.2d 324 (Tex. App.—Austin 1991, no writ).........................42

## CITY ORDINANCES

Austin City Code, Chapter 25-10.........................................................................5

Austin City Code, Section 25-10-152(F)(1)(d).................................................26, 27

Austin City Code, Section 25-10-152(F)(1)(e).................................................26, 27

Austin City Code, Section 25-10-237..................................................................27

Austin City Ordinance No. 20080605-076 ............................................................5

Austin City Ordinance No. 20120405-007 ............................................................6

## RULES

Fed. R. Civ. P. 59 ............................................................................................42

Fed. R. Civ. P. 60(c)(1)....................................................................................42

Fed. R. Civ. P. 62.1(a)......................................................................................42

## CONSTITUTIONS & STATUTES

Tex. Civ. Prac. & Rem Code § 16.064 .................................... 15, 20, 41, 42, 43, 45

Tex. Civ. Prac. & Rem Code § 16.064(a)(2) ............................................................ 41

Tex. Const. art. VIII, § 1(f) .................................................................................. 26

Texas Occupations Code.......................................................................................... 26

28 U.S.C. § 1341 .................................................................................................... 22

NO. 03-15-00370-CV

_____

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
TRAVIS COUNTY, AUSTIN, TEXAS

_____

REAGAN NATIONAL ADVERTISING OF AUSTIN, INC., APPELLANT

VS.

THE CITY OF AUSTIN AND MARC A. OTT, IN HIS OFFICIAL CAPACITY,
APPELLEES

_____

ON APPEAL FROM
THE 200th JUDICIAL DISTRICT COURT
TRAVIS COUNTY, TEXAS
CAUSE NO. D-1-GN-12-001211

_____

APPELLANT'S BRIEF

_____

TO THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS:

Appellant Reagan National Advertising of Austin, Inc. ("Reagan"), through its undersigned counsel, offers this Appellant's Brief, by which Reagan respectfully would show the Court the following:

1

STATEMENT OF THE CASE

In April of 2010, Reagan filed Civil Action No. 1:10-cv-275, *Reagan Nat'l Advertising of Austin, Inc. v. City of Austin et al.*, in the United States District Court for the Western District of Texas, Austin Division ("Federal Action"), to challenge the constitutionality of the City of Austin's billboard registration fee. CR 361, SF #34.[1] On November 30, 2011, after a bench trial on a stipulated record, Judge Lee Yeakel concluded the federal court lacked subject matter jurisdiction based on the federal Tax Injunction Act and dismissed the case. CR 361, SF #35.

On April 25, 2012, Reagan filed a new suit raising the same claims in the Travis County District Court. CR 361, SF #37; CR 4. Both parties filed motions for summary judgment, which were denied. CR 197. The case was tried to the bench on December 15, 2014. RR2.[2] After trial, Reagan supplemented the record with evidence on attorneys' fees. CR 386; CR 509. On March 31, 2015, Judge Stephen Yelenosky entered a take nothing judgment. CR 508; s*ee* Appendix A. On April 29, 2015, Reagan filed a motion for a new trial. CR 524. Upon request, the trial court entered Findings of Fact and Conclusions of Law, which it later modified. CR 515; CR 535; CR 561; *see* Appendix B. The trial court did not act on the motion for new trial. On June 16, 2015, Reagan filed a notice of appeal. CR 566.

---

[1] "CR" refers to the Clerk's Record. "SF" refers to a Stipulated Fact taken from the Joint Stipulation of Facts located at CR 359-363.

[2] "RR" refers to the Reporter's Record. "RR2" refers to the second volume of the Reporter's Record.

## STATEMENT REGARDING ORAL ARGUMENT

Reagan requests oral argument because this case presents two questions that deal with issues not adequately addressed by Texas case law.

The first question involves whether a dismissal for lack of subject matter jurisdiction can be res judicata as to more than jurisdiction alone when the basis for dismissal encompassed a determination of the core issue in the case – whether a particular fee was a constitutional fee or unconstitutional tax. The initial case was dismissed by a federal court after a determination, for the purposes of the Tax Injunction Act on which the dismissal was based, that the fee was a tax. Should the federal court's rulings or any of its specific findings have been recognized as having some effect in the subsequent state case?

The second question is whether court intervention is warranted where a city nearly doubled a fee before analyzing whether an increase was appropriate and where the city continued to charge the increased fee after its own staff concluded the fee was too high. Although courts may hesitate to involve themselves in policing municipal governments, do the fee payers warrant protection in this instance?

Oral argument would allow the Court and the parties to address the existing body of law on these issues and determine whether clarification or extension of the law might be needed in either area.

## ISSUES PRESENTED

This appeal presents four issues.

(1)     Did the trial court err in ruling that res judicata did not apply and entering findings and conclusions that conflicted with the findings and conclusions of a federal judge in a prior related proceeding?

(2)     Did the trial court err in concluding that the City's billboard registration fee was a proper fee and not an unconstitutional tax, or did the evidence support the trial court's findings?

(3)     Did the trial court err in concluding that Reagan's claims for fees paid for 2009 and 2010 were time barred where Reagan filed its lawsuit within 60 days of the dismissal of a prior lawsuit for lack of subject matter jurisdiction becoming final?

(4)     Did the trial court err in failing to order that Reagan was entitled at least to a return of the amounts it paid in excess of $190 for the four years that the City charged a fee of $200 and in failing to award attorneys' fees, given the City's acknowledgment that the $200 fee was excessive?

STATEMENT OF FACTS

Reagan is in the business of outdoor advertising, which includes the ownership and operation of billboards within the City of Austin and the surrounding area.[3] The City regulates billboards (also called off-premise signs) in Chapter 25-10 of the Austin City Code.[4]

1.    The Evolution of the City's Billboard Registration Program and Fee

Before the City Council amended the City's billboard regulations in June of 2008, the City Code required landowners (not sign owners) to register billboards on their land every other year.[5] The registration fee was $220 per billboard every two years.[6]

In June of 2008, the City amended its billboard regulations through Austin City Ordinance No. 20080605-076 ("2008 Ordinance").[7] *See* Appendix F. The 2008 Ordinance required sign owners (rather than the owners of the real property on which the signs were located) to register every year on a form prescribed by the City and to provide an annual inventory of signs to the City.[8] The 2008 Ordinance also required identifying markers to be placed on the signs, some of which would

---

[3] CR 359, SF #2 and #5.
[4] CR 359, SF #7 and #9; Austin City Code Section 25-10-152 is provided at Appendix H.
[5] CR 360, SF #12.
[6] CR 360, SF #13.
[7] CR 360, SF #14; RR3, PE 2. "PE" refers to Plaintiff's Exhibit. "DE" will refer to "Defendants' Exhibit."
[8] RR3, PE 2, COA 0026.

5

assist in the verification of the sign height.[9] The 2008 Ordinance further required the City to notify the billboard owners of a pending expiration of registration.[10] It also prohibited relocation of the billboard if the registration requirement was not met, and it authorized the imposition of a fine of up to $500 per day for each sign that was not registered.[11] The 2008 Ordinance further authorized the creation of an online database of the billboard inventory.[12] In effect, instead of having to deal with nearly 500 different registrations from landowners, the City's new program called for bulk registrations from approximately eight billboard companies.[13]

Beginning in 2009, the City required billboard owners to pay a registration fee of $200 per billboard per year.[14] When the City Council passed this increase, it was told that its new fee would be $20 less than the previous fee; actually, the new fee increased the effective cost per billboard from $110 to $200 per year.[15] The City charged $200 per billboard per year for 2009, 2010, 2011 and 2012.[16]

On April 5, 2012, the City Council adopted Ordinance No. 20120405-007, reducing the registration fee from $200 per billboard per year to $190 per billboard

---

[9] RR3, PE 2, COA 0026.
[10] RR3, PE 2, COA 0026.
[11] RR3, PE 2, COA 0026-0027.
[12] RR3, PE 2, COA 0027.
[13] RR3, PE 13; RR2, 104:11-105:23 and 139:9-24.
[14] CR 360, SF #15 and #16.
[15] RR3, PE 12, COA 0073.
[16] CR 360, SF #16.

per year.[17] *See* Appendix G. For 2013 and 2014, the City required billboard owners to pay $190 per billboard per year.[18]

2.    Reagan's Billboard Registration Fee Payments to the City

From 2009 through 2014, Reagan made the following billboard registration fee payments, under protest, to the City of Austin:

| Year | Per Billboard Fee | Number of Billboards | Total Payment |
|------|-------------------|----------------------|---------------|
| 2009 | $200 | 389 | $77,800.00 |
| 2010 | $200 | 376 | $75,221.40 |
| 2011 | $200 | 417 | $83,400.00 |
| 2012 | $200 | 408 | $81,600.00 |
| 2013 | $190 | 425 | $80,750.00 |
| 2014 | $190 | 419[19] | $79,610.00[20] |

Failure to register could amount to a penalty of $500 per day per sign.[21]

3.    The City's Analysis of the Cost of the Billboard Registration Program

Before adopting the $200 per billboard per year fee, the City did not prepare a study, budget or survey to determine its cost to implement the billboard registration program called for by the 2008 Ordinance.[22] Further, the City did not ask Charles Boas, the code enforcement inspector assigned responsibility for the

---

[17] CR 360, SF #17; RR4, DE 2.
[18] CR 360, SF #18.
[19] CR 329-330, p. 7-8, ft. 1-6.
[20] CR 362, SF #38 - #43.
[21] RR2, 51:21-52:3; RR3, PE 2, COA 0027.
[22] CR 360, SF #21.

7

new billboard registration program,[23] to assess the program and give input on what kind of efforts the billboard registration program would require.[24]

After the City implemented the $200 per billboard per year fee, Robert Rowan, a city employee, analyzed the costs of the program and sent the November 9, 2009, email reflected in Plaintiff's Exhibit 8.[25] *See* Appendix I. That email says:

> Based on last week's meeting in regards to the current Billboard Registration fee of $200, we were asked to review the current fee and see if we can seriously look at lowering the fee to a more reasonable fee. As a result, this can close the gap between the revenue and the expenditures of running this program. Just doing a quick overview, we can lower the rate to $140, which will accomplish this goal.[26]

The analysis attached to the email indicates that, even at $140, the City's revenue would exceed its costs by approximately $2500.[27] Mr. Rowan's analysis was submitted to Matt Christianson and Daniel Cardenas.[28] Mr. Christianson was Mr. Boas's supervisor,[29] and Mr. Cardenas was Mr. Christianson's supervisor and an assistant Director of the Austin Code Department, the department responsible for billboard registration.[30]

Sometime after the email reflected in Plaintiff's Exhibit 8 was sent, Mr. Cardenas was asked by Willie Rhodes, his Director, to analyze the cost of the

---

[23] RR2, 76:7-77:2.
[24] RR2, 98:15-99:6.
[25] CR 360, SF # 22; RR3 PE 8.
[26] RR3, PE 8.
[27] RR3, PE 8.
[28] RR3, PE 8.
[29] RR2, 109:10-14.
[30] RR2, 107:19-25; CR 360, SF #20 and #23.

billboard registration program.[31] Mr. Cardenas concluded that the program required a fee of $242 per billboard per year.[32] After communicating with Mr. Rhodes, Mr. Cardenas modified his analysis and concluded a required fee of $352 per billboard per year.[33]

In preparing his analysis, Mr. Cardenas did not review annual budget documents for the year the fee was amended[34] or obtain assistance from the Budget Office, which is responsible for monitoring the financial performance of all City departments and providing assistance with budgets and other financial issues.[35] The model developed by Mr. Cardenas included 21 staff positions, including a Performance Specialist, a Municipal Court Coordinator, a Paralegal, and an Attorney Senior, charged two full-time vehicles, assumed over 500 mailings (even though only a handful of billboard companies would be registering), and assumed administration of the sign relocation process.[36] (Billboard relocation, however, has its own permit processes and fees,[37] enforcement actions have fines associated with them, and even changes to billboards have their own processes and fees, apart from the billboard registration fee.[38]) Mr. Cardenas's revised analysis also included the

---

[31] CR 360, SF #23, #24, and #25.
[32] CR 361, SF #26; RR3, PE 10.
[33] CR 361, SF #26; RR3, PE 11.
[34] CR 361, SF #27.
[35] CR 361, SF #28 and #29.
[36] RR3, PE 11.
[37] RR2, 114:2-11.
[38] RR2, 114:12-115:13 and 116:16-117:12.

costs to develop a searchable Web presentation for a database of billboard registrations and a $20,000 violation placard annual contract that the City did not use or purchase.[39] Mr. Cardenas's analysis did not consider fees charged by other Texas cities for billboard registration programs.[40]

After Reagan initiated litigation about the billboard registration fee, the City retained The PFM Group and Nickie Whitaker to do a "Billboard Registration Fee Study" (the Whitaker Report").[41] *See* Appendix J, the Whitaker Report without its attachments. The Whitaker Report was issued in January of 2011, took about 30 days to complete, and concluded that "the cost of service for administering the billboard registration fee is $190."[42]

The Whitaker Report was a "point in time" analysis based on Mr. Boas's estimate that he spent two hours per sign per year.[43] At trial, Ms. Whitaker acknowledged that a fifteen-minute variance on the two-hour estimate could have a 12.5% impact on the final number.[44]

In preparing her report, Ms. Whitaker interviewed only two city employees (Mr. Boas and Kesha Moore, his replacement). She did not meet with either

---

[39] CR 361, SF #30 and #33; RR3 PE 11.
[40] CR 361, SF #32.
[41] RR4, DE 10; RR2, 196:18-22.
[42] RR4, DE 10, p. 4; RR2, 163:23-25.
[43] RR4, DE 10; RR3, PE 4; RR2 175:22-176:13 and 177:15-178:5.
[44] RR2, 181:16-182:9.

employee in person.[45] She did not review the employees' documents or look at support for any of the information she was given.[46] She relied on employee estimates, without requiring any tracking of time to determine the actual time spent per registration.[47] She did not assess whether the time estimates she was given made sense in light of the total hours worked by each employee.[48] She determined "productive time" by backing out vacation days, sick days, and the like, but did not verify, for example, whether the employee was eligible for the amount of vacation time she deducted.[49] She did not speak to anyone in accounting with the City.[50] She was not given Mr. Rowan's analysis and was given only one of Mr. Cardenas's analyses.[51] She did not focus on what the ordinance required; instead, she focused on how the City implemented the ordinance.[52] She also assumed that Mr. Boas's two-hour per billboard estimate would apply year in and year out in perpetuity.[53] Mr. Boas, however, testified that the initial inventory and registrations took several years to complete[54] but that he expected that the amount of time it would take to do the work required by the 2008 Ordinance would

---

[45] RR2, 77:3-8, 170:24-171:11, 172:4-6 and 172:10-12.
[46] RR2, 172:7-9.
[47] RR2, 151:19-152:16.
[48] RR2 169:10-170:7.
[49] RR2 178:12-181:9.
[50] RR2, 192:9-21.
[51] RR2, 173:8-174:17.
[52] RR2, 174:22-175:8.
[53] RR2, 183:18-184:1 and 199:5-12.
[54] RR2, 85:11-862.

decrease over time.[55] Further, Ms. Whitaker testified that cost of service should be reviewed every four years or when there has been a significant change in the administration of the program.[56]

Ms. Whitaker did not review fees charged by other cities.[57] At trial, Reagan offered evidence of what other cities in Texas charge, such as Fort Worth, which charges $150 every three years,[58] San Antonio, which charges approximately $50 or $79 per year, depending on the square footage of the sign,[59] and Houston, which charges $110.75 annually.[60]

4.    Reagan's Analysis of the Cost of the Billboard Registration Program

For trial, Reagan retained Tom Granger of Midwikis & Granger, P.C., an accountant with experience in business valuation,[61] to offer an opinion on what the City's billboard registration fee should be to comply with state statutes limiting the fee to the cost to provide the service.[62] Mr. Granger testified that he Reagan's trial brief, the joint stipulations of facts and evidence, various City ordinances, the City's fee schedule from 2008 and 2009, depositions of Mr. Boas, Mr. Cardenas and Ms. King, another City of Austin employee, the standards for the billboard

---

[55] RR2, 130:7-131:18.
[56] RR2 158:20-159:2.
[57] RR2, 182:10-183:10.
[58] RR3, PE 25; RR2 41:12-24.
[59] RR3, PE 26; RR2 45:6-23.
[60] RR3, PE 27; RR2 46:1-2.
[61] RR2, 34:1-16.
[62] RR3, PE 22 and PE 23.

registration program that the City implemented effective April 15, 2010, the 2009 email from Mr. Rowan regarding the City's fee, the Whitaker Report, and the report and deposition of Erin Anker that was offered by Reagan in the Federal Action.[63] He also looked at how much other Texas cities charge.[64]

Mr. Granger raised concerns about the City's various analyses. He pointed out that the amount of labor allocated to code inspectors was inconsistent,[65] that Ms. Whitaker's analysis used an excessive amount of sick leave, which resulted in a higher than appropriate productive hour calculation,[66] and that it was not clear whether the analyses properly differentiated between registration and other activities, such as relocation.[67] Mr. Granger's methodology considered the differing data used by Mr. Rowan, Mr. Cardenas and Ms. Whitaker in the iterations of the City's analysis, averaging them to arrive at his opinion of a neutral fee.[68]

Mr. Granger concluded that the City's $200 per sign per year fee exceeds the cost to deliver the services required by the City's ordinance and that a revenue neutral fee would be $115 per sign per year.[69] He also concluded that the total amount of charges to Reagan in excess of $115 per sign per year was $198,450.[70]

---

[63] RR2 36:18-37:23.
[64] RR2 37:24-38:9.
[65] RR2 48:23-50:6.
[66] RR2 63:21-64:6.
[67] RR2 57:13-59:25.
[68] RR2, PE 23; RR2 48:23-50:6; RR2 69:25-70:8.
[69] RR3, PE 23; RR2 60:2-12.
[70] RR2, 61:17-62:24.

5.    The Trial Court's Ruling and Findings of Fact and Conclusions of Law

After a bench trial, Judge Stephen Yelenosky filed a letter announcing his "intended ruling and some significant reasons for it."[71] Judge Yelenosky indicated that the letter "does not constitute findings of fact or conclusions of law."[72] Judge Yelenosky then entered a Final Judgment denying Reagan's request for relief and ordering that Reagan take nothing.[73]

After entering the Final Judgment, Judge Yelenosky filed Findings of Fact and Conclusions of Law.[74] Reagan requested additional and amended findings.[75] Judge Yelenosky entered Amended Findings of Fact and Conclusions of Law.[76]

6.    Background Relevant to the Issues of Res Judicata and Limitations.

In Reagan's 2010 Federal Action[77] before Judge Yeakel, the federal court determined, "the City's annual $200-per billboard registration fee, for the purposes of the [Tax Injunction] Act, is a tax."[78] In making the determination in its Findings of Fact and Conclusions of Law, Judge Yeakel also found that "the City's billboard-registration fee benefits the entire community rather than only defraying

---

[71] CR 383.
[72] CR 383.
[73] CR 508.
[74] CR 535.
[75] CR 540.
[76] CR 561.
[77] As set forth in the Statement of the Case, the Federal Action was dismissed on November 30, 2011. CR 361 SF #35; RR3 PE 16.
[78] RR3, PE 15, p. 13.

the City's reasonable costs of registering billboards."[79] He further noted that the City's expert had admitted "that it could be useful to review what comparable jurisdictions charge as billboard registration fees."[80]

In Reagan's present action,[81] both sides filed motions for summary judgment.[82] The City's motion for summary judgment included a claim that limitations had run on Reagan's claims as to fees paid for 2009 and 2010 because Reagan did not file the present action within 60 days of the dismissal of the Federal Action.[83] After a hearing, Judge John Dietz denied both parties' motions and entered an order that said:

> Plaintiff's motion for new trial was denied by written order on February 6, 2012. A motion for reconsideration could have been filed within 28 days – or by March 5, 2012. Sixty days from March 5 was May 4, 2012. This suit was filed on April 25, 2012, so it was timely under CPRC § 16.064. [84]

At trial, the City again raised the issue of limitations for 2009 and 2010.[85] After trial, Judge Yelenosky indicated that the City's defense of limitations had no merit.[86] However, after entering the Final Judgment, Judge Yelenosky filed Findings of Fact and Conclusions of Law that included a conclusion that Reagan's

---

[79] RR3 15, p. 13.
[80] RR3, PE 15, p. 12-13.
[81] As set forth in the Statement of the Case, Reagan's present action was filed on April 25, 2012. CR 361 SF #37.
[82] CR 27; SCR 3. "SCR" refers to the Supplemental Clerk's Record.
[83] SCR 8; CR 103; CR 191.
[84] CR 197.
[85] CR 351; CR 355.
[86] CR 383.

claims for fees paid for 2009 and 2010 were time barred.[87] Reagan requested additional and amended findings.[88] Judge Yelenosky entered Amended Findings of Fact and Conclusions of Law but did not change his conclusion that Reagan's claims for 2009 and 2010 were time barred.[89]

---

[87] CR 539.
[88] CR 540.
[89] CR 565.

# SUMMARY OF THE ARGUMENT

Reagan has tried this case twice. First, it tried the case on a stipulated record in federal court. That case resulted in the federal court dismissing the case for lack of jurisdiction after it sua sponte raised the issue of the Tax Injunction Act, which prevents a federal court from taking certain actions as to taxes under state laws, unless a plain, speedy and efficient remedy is not available in state courts. Because the federal court decided that the registration fee was a tax, it lacked jurisdiction under the Tax Injunction Act and dismissed the case without prejudice. Reagan then refiled the case in state court and tried it again to the bench, this time on a partially stipulated record. After the second trial, the trial judge decided that the registration fee was a fee, not a tax, and entered a conclusion of law that Reagan's claims for the years 2009 and 2010 were barred by limitations. Reagan appeals because the state court trial judge's determinations conflict with the findings of the federal court judge and because the state court trial judge's determinations are not supported by the law or the evidence in this case.

For a municipal charge to be a fee and not a tax, the charge's primary purpose must be for regulation, rather than revenue, and the charge cannot be excessive or more than reasonably necessary to cover the cost of the regulation, or it must bear some reasonable relationship to the legitimate object of the ordinance. The evidence in this case is that the City nearly doubled its billboard registration

17

fee – from charging the landowner $220 per billboard every two years to charging the billboard owner $200 per billboard per year – without assessing the cost of the regulation. Additionally, the evidence is that the City Council was told the fee was being decreased by $20, when in fact it was being nearly doubled.

After raising the fee and before litigation was filed, the City did an internal assessment and concluded that it could reduce the fee from $200 per billboard per year to $140 per billboard per year to accomplish the goal of closing the "gap between the revenue and expenditures of running this program." But the City did not reduce the fee. It continued to charge $200.

The City later did a second internal analysis in which the Assistant Director of the Austin Code Department concluded that the cost of the billboard registration program was $242 per billboard per year. After consulting with his boss, the Assistant Director changed the cost to $352. Both analyses including activities not authorized by the enacting ordinance, made faulty assumptions, and included activities for which the City charges other fees, wholly separate from the registration fee.

The City, for litigation, hired an outside expert who concluded in January of 2011, largely was based on one inspector's unverified estimate that he spent two hours per sign per year, that the cost of administering the billboard registration fee was $190. The expert did not know what the enacting ordinance required and did

not ask the City about the work the inspector reported doing to learn whether it was required by the ordinance. Additionally, she did a "point in time" analysis, not an analysis of the City's ongoing cost of registering the program. Based on her analysis, the City reduced its fee, beginning in 2013, from $200 per billboard per year to $190 per billboard per year.

Municipal fees are presumed reasonable, but the law allows for review of those fees and requires that fees be reasonably necessary to cover the cost of the regulation. Reagan offered internal City communications that took place before litigation was initiated in which the City acknowledged that its per-year fee was at least $60 too high. Further, Reagan showed that subsequent efforts to justify the fee included costs for activities not properly within the scope of the enacting ordinance. To allow a city to nearly double a fee with no prior consideration to whether an increase is warranted, allow arbitrary and imprecise estimates to support a fee after that fact, and focus on costs regardless of whether those costs were for activity reasonably related to the purpose of the ordinance gives cities more authority than was intended under the law. The federal court's findings should have been honored by the ruling of the trial judge.

Additionally, the trial court erred in concluding that Reagan's claims for 2009 and 2010 were time barred. Reagan's claims were filed within 60 days of the federal court's ruling becoming final, which makes those claims timely under

19

Section 16.064 of the Texas Civil Practice and Remedies Code. The evidence will show that the trial judge initially concluded that the claims were timely, but entered a conclusion of law proposed by the City that conflicted with the judge's previously articulated ruling.

Reagan asks that the court reverse the trial court's findings, find that the billboard registration fee is an unconstitutional tax, require that Reagan be reimbursed the portion of the fee that amounts to an unconstitutional tax, and award attorneys' fees. Alternatively, Reagan asks that the Court award Reagan reimbursement of fees paid in excess of $190 for the years 2009, 2010, 2011, and 2012, and attorneys' fees.

I.     The standard of review.

Where the trial court issues findings of fact and conclusions of law, the appellate court should apply a sufficiency of the evidence review to the factual findings and review the conclusions of law de novo. *Black v. City of Killeen*, 78 S.W.3d 686, 691 (Tex. App.—Austin 2002, pet. denied). Under the de novo standard, the appellate court conducts an independent analysis of the record and does not defer to the trial court's conclusions; instead, it reaches its own conclusions and can substitute those conclusions for those of the trial court. *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 2004). The issue of whether a municipal fee is valid is a question of law. *Black*, 78 S.W.3d at 691.

II.    Issue No. 1: The trial court erred in finding that res judicata did not apply and entering findings and conclusions that conflicted with the findings and conclusions of a federal judge entered after a full trial on a stipulated record.

Prior to trial, Reagan filed a motion for summary judgment on whether Judge's Yeakel's ruling in the Federal Action based on the Tax Injunction Act was res judicata to this suit. CR 27. The trial court denied that motion. CR 197. Reagan raised the issue again at trial. CR 323. The trial court entered a Conclusion of Law that "Judge Yeakel's ruling based on the Tax Injunction Act is not res judicata as to this suit." CR 565. The trial court erred on that conclusion of law.[90] Res judicata

---

[90] Reagan proposed the following conclusion of law: "Res judicata bars relitigation of Plaintiff's claims." CR 369. After the trial court entered its judgment, Reagan submitted a request for

should have barred re-litigation of the issue. *See Igal v. Brightstar Info. Tech.*, 250 S.W.3d 78, 86 (Tex. 2008).

Whether the City's registration fee is a tax was previously decided by Judge Yeakel in the Federal Action. Judge Yeakel dismissed the Federal Action for lack of subject matter jurisdiction based on the Tax Injunction Act, which prevents federal courts from enjoining, suspending, or restraining assessment, levy or collection of any tax under state law, as long as a plain, speedy, and efficient remedy may be had in the courts of the state. *See* 28 U.S.C. § 1341, Appendix C. In determining the Tax Injunction Act applied to bar the federal court's jurisdiction, Judge Yeakel decided that the registration fee ordinance at issue imposed a tax. Because it imposed a tax, the federal court lacked jurisdiction under the Tax Injunction Act. He also found that that the City's fee did more than defray the reasonable cost of registering billboards and that looking at what comparable jurisdictions charge could be useful in assessing the fee.

Under Texas law, for res judicata to apply, there must have been a final judgment on the merits by a court of competent jurisdiction, the parties in the first suit must have been the same as in the second suit, and the second suit must be based on claims that were raised or could have been raised in the first suit. *Citizens Ins. v. Daccach*, 217 S.W.3d 430, 449 (Tex. 2007). Reagan acknowledges that,

findings of fact and conclusions of law that included the following: "Res judicata does not bar relitigation of Plaintiff's claims." CR 522. However, Reagan pointed out that it did not agree with or consent to the proposed finding. CR 515.

22

under Texas law, "[a]lthough a dismissal for lack of subject matter jurisdiction does not preclude a party from litigating the merits in a court of competent jurisdiction, it is res judicata as to the issue of whether the first court had jurisdiction." *Butler v. Continental Airlines, Inc.*, 116 S.W.3d 286, 287 (Tex. App.—Houston 2003, pet. denied).

Ordinarily, a dismissal for lack of subject matter jurisdiction would not bar re-litigation of claims. However, in this case, after trial, the federal court sua sponte raised a question about jurisdiction.[91] To decide whether it had jurisdiction, the federal court had to determine whether the registration fee was a fee or a tax. The parties were identical, the claims were identical, and the federal court entered a final judgment dismissing for lack of jurisdiction based on its determination that the registration fee was actually a tax. On a stipulated record involving identical claims and identical parties, the federal court also decided after a trial that the billboard registration fee exceeded what was reasonably necessary to cover the cost of regulation. The trial court, having fully retried that issue, now says it disagrees with the federal court's conclusion. In expressing that disagreement prior to entering a judgment, the trial court cited the differences in the burdens under the federal analysis and the state analysis. In a letter that the trial court specifically said did not amount to findings of fact or conclusions of law, the trial court noted that,

---

[91] CR 531.

"between the Tax Injunction Act and the Texas constitutional prohibition on municipal occupation taxes, the questions are not the same and the burdens are reversed." CR 384.

But the questions are the same. The federal court had to examine whether the registration fee's primary purpose was for regulation or for raising revenue. *Hill v.* Kemp, 478 F.3d 1236, 1244 (10th Cir. 2007). The Texas Constitution requires the same test: "whether an exaction authorized by statute or ordinance constitutes an occupation tax or a license fee, the test is whether the primary purpose of the exaction, when the statute or ordinance is considered as a whole, is for regulation or for raising revenue." *City of Houston v. Harris County Outdoor Advertising Assoc.*, 879 S.W.2d 322, 326 (Tex. App. – Houston [14th Dist.] 1994, writ denied). Further, even if the burdens differ and a record "devoid of proof" would fall in favor of the taxpayer in federal court but the municipality in state court, as the trial judge indicated in his letter of December 24, 2014, the Federal Action was not decided on a record devoid of proof. The federal court made that ruling after a full trial based on "conflicting evidence presented about the reasonable cost of registering billboards." [92]

Res judicata has multiple purposes, including the need to maintain the stability of court decisions and promote judicial economy. *Barr v. Resolution Trust*

---

[92] RR3, PE 15, p. 13.

24

*Corp.*, 837 S.W.2d 627, 629 (Tex. 1992). The trial court's retrial and subsequent ruling in this case has resulted in the type of conflict and instability in court decisions that res judicata principles were intended to avoid. To avoid that conflict, the trial court should have honored the specific factual findings and the conclusions of the federal court. Alternatively, the trial court should have honored at least the specific factual findings made by the federal court in the previous trial of these claims as it determined the merits of this case. Instead, in finding that res judicata did not apply, the trial court gave the City a second shot at litigating the reasonableness of its fee, creating a conflicting result.

III.    Issue No. 2: The trial court erred in concluding that the City's billboard registration fee was a fee rather than a tax, given the arbitrary near doubling of the fee, the absence of any assessment of costs until after the fee was increased, and the unreliable and imprecise assessment of costs performed by the City's expert.

The trial court also should be reversed because the evidence does not support the trial court's findings and conclusions about whether the billboard registration fee was a permissible fee or an unconstitutional tax. CR 565, Conclusions of Law 3-5; CR 564-565, Findings of Fact 45-52.

A.    Under Texas law, a municipality cannot impose an occupation tax on a particular industry if the State of Texas has not imposed an occupation tax.

The parties in this case do not differ on the law applicable to the municipality's imposition of an occupation tax. The Texas Constitution states:

25

> The occupation tax levied by any county, city or town for any year on persons or corporations pursuing any profession or business, shall not exceed one half of the tax levied by the State for the same period on such profession or business.

Tex. Const. art. VIII, § 1(f); *see* Appendix D. This provision prohibits a municipality from levying an occupation tax where no such tax has been previously levied by the State. *City of Houston v. Harris County Outdoor Advertising Assoc.*, 879 S.W.2d 322, 326 (Tex. App. – Houston [14th Dist.] 1994, writ denied), *cert. denied*, 516 U.S. 822 (1995)(citing *Hoefling v. City of San Antonio*, 20 S.W. 85, 88-89 (Tex. 1892) and *Pierce v. City of Stephenville*, 206 S.W.2d 848, 850 (Tex. Civ. App. – Eastland 1947, no writ)). The State of Texas has not levied an occupation tax on the off-premise sign industry. *City of Houston*, 879 S.W.2d at 326; *see generally* Tex. Occ. Code. The City, therefore, cannot impose an occupation tax on the off-premise sign industry. If the City's billboard registration fee is an occupation tax, then the City violated – and continues to violate – article VIII, § 1(f).[93]

---

[93] Not disputed before the trial court is that the Due Process Clause applies to any unlawful collection of taxes, including ones that violate state law or provisions of the State Constitution. *City of Houston,* 879 S.W.2d at 333 (citing *Smith v. Travis County Educ. Dist.*, 791 F. Supp. 1170, 1178 n.5 (W.D. Tex.), *vacated on other grounds*, 968 F.2d 453 (5th Cir. 1992)). A state must provide procedural safeguards against unlawful tax exactions to satisfy the Due Process Clause. *McKesson Corp. v. Division of Alcohol Beverages and Tobacco, Dept. of Business Regulation of Florida*, 496 U.S. 18 (1990). When the state places a taxpayer under duress to pay a tax promptly when due and relegates the taxpayer to a post-payment refund action to challenge the tax's legality, the Due Process clause obligates the state to provide meaningful backward-looking relief to rectify any unconstitutional deprivation that occurs. *Id.* Failure to register a sign and pay the fee is a punishable offense and affects relocation rights. Austin City Code Section

B.     To determine whether the fee is a permissible fee or an unconstitutional tax, the trial court was required to consider whether the purpose of the fee was regulation or revenue and whether the fee was more than reasonably necessary to cover the cost of regulation.

Whether an exaction is an occupation tax or a license fee depends on whether its primary purpose is regulation or raising revenue. *City of Houston*, 879 S.W.2d at 326 (citing *Hurt v. Cooper*, 110 S.W.2d 896, 899 (Tex. 1937) and *City of Fort Worth v. Gulf Refining Co.*, 83 S.W.2d 610, 617 (Tex. 1935)). If the primary purpose is for regulation, then it is a license fee; if the primary purpose is to raise revenue, then it is an occupation tax. *Id.* In making this determination, the Court must consider the reasonableness of the fee. *Id.* "[A] license fee cannot be excessive nor more than reasonably necessary to cover the cost of granting the license and of exercising proper police regulation, or it must bear some reasonable relationship to the legitimate object of the licensing ordinance." *Id.* at 326-27. The nature of the business to be controlled and the necessity and character of the regulations are what the court should look at in determining the reasonableness of the fees imposed. *City of Houston*, 879 S.W.2d at 327. Municipal fees are prima facie valid and presumed reasonable; to overcome that presumption is an extraordinary burden. *City of Brookside Village v. Comeau*, 633 S.W.2d 790, 792

---

25-10-152(F)(1)(d) and (e), 25-10-237. Here, the evidence is undisputed that Reagan paid the fees under protest. CR 362, SF # 38 – #43.

(Tex. 1982); *City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 805 (Tex. 1984).

C.   This appeal challenges the trial court's Additional Findings of Fact and Conclusions of Law related to the issue of whether the billboard registration fee is a fee.

In this case, the trial judge concluded that the City's billboard registration fee is a permissible fee rather than a tax. On this issue, the trial court issued the following Conclusions of law:

3.   There is a reasonable relationship between the amount of the fee and the City's costs.
4.   The primary purpose of the fee, in light of the ordinance that authorizes the fee as a whole, is for regulation.
5.   The City's fee is reasonable and constitutional.

CR 565. The trial court also entered the eight following Additional Findings of Fact:

45.   Registration and regulation program consists of review of billboard records and details, inspection, enforcement, correspondence, legal assistance, financial activities, and data entry.
46.   Ms. Whitaker's methodology was to determine the City's salary costs by calculating the average amount of time employees spent on activities related to the billboard registration program and then determine the overhead rates (non-salary costs) allocated by employee based on four cost factors.
47.   Ms. Whitaker's study demonstrates that the billboard registration fee covers salary costs, fringe benefits (for employees), direct costs, internal indirect costs, and external indirect costs for each department involved in the billboard registration program.
48.   Ms. Whitaker's study found City's cost is $193.46 per sign per year.

28

49. On April 5, 2012, Council found that (A) the City has the authority to regulate billboards; (B) the City's ability to enforce regulations have been hampered; (C) it is necessary to require registration for effective enforcement of all current non-conforming off-premises sign regulations; (D) registration information must be collected, verified, and on-site inspections should be conducted; and (E) that the City's costs are $190 per sign per year.
50. City Council relied on a "cost of service" study conducted in 2011 and the study is referenced in the ordinance.
51. The activities performed for the billboard registration program are related to the program.
52. The fee is based on the City's costs for actual activities performed.

CR 564-565.

All of these findings and conclusions were attempts to show that the City's fee was reasonable. The problem is that there is no evidence to support these findings and conclusions. The City did nothing to determine whether there was a reasonable relationship between the amount of the fee and the City's costs until after the City had nearly doubled the fee. The City initially acknowledged that the fee was approximately $60 too high. Later analyses by the City were based on costs that were not reasonable or necessary towards the implementation of the billboard registration program call for by the 2008 Ordinance. Finally, the City's expert, retained for the purpose of litigation, delivered a "point in time" analysis that was based on arbitrary estimates with no consideration for whether the program, as administered by the City, was consistent with the program called for by the 2008 Ordinance. Each of these issues is addressed in turn.

1. The City did no assessment of its costs prior to raising the fee, and, before any lawsuit was filed, the City acknowledged that its increased fee was approximately $60 too high.

No one disputes that the City did not assess its costs before raising the billboard registration fee from $220 every two years to $200 each year. CR 360, SF #21. In fact, before any lawsuit was filed, the City's accounting department acknowledged the existence of a "gap between the revenue and expenditures of running this program" and concluded "we can lower to rate to $140, which will accomplish [the] goal" of closing the gap. *Id*. Even at $140, the City's revenue would exceed its costs by approximately $2500. *Id*. (analysis attached to email).

2. Early attempts to justify the fee included actions and programs beyond those authorized by the enacting ordinance.

After the City's initial analysis resulted in a recommendation of a reduction of the fee by $60, the City, through Mr. Cardenas, an Assistant Director of the Austin Code Department, performed two other internal analyses that concluded the per billboard costs were $242 or $352 per billboard per year. RR3, PE 10 and PE 11. Those analyses both included costs not authorized by the 2008 Ordinance.

The 2008 Ordinance called for the City to (a) receive bulk registrations annually from a small number of billboard companies, (b) verify the information on those registrations, (c) notify the sign owner of pending expiration of registrations, (d) restrict relocation of signs if the registration requirements were not met, (e) punish those who failed to register with a fine, and (f) create an online

database of billboard inventory. *See* Statement of Facts, Part 1 above and Appendix F (RR3, PE 2).

As indicated in Statement of Facts, Part 3 above, Mr. Cardenas did not review budget documents or get assistance from the City's Budget Office. He assumed the need for 21 staff positions, two full-time vehicles, and over 500 mailings (even though the 2008 Ordinance no longer called for communication with over 500 landowners but only a handful of billboard companies). He assumed administration of the sign relocation process, which has its own permit process and fees, entirely separate from the billboard registration fee. He also assumed the costs of enforcement, which also has its own process and fees. Even requests for changes to billboards have their own fees associated with them. Additionally, his analysis included costs that have not been incurred – the creation of a searchable database and a $20,000 violation placard contract. The costs determined by Mr. Cardenas are not reasonably related to the requirements of the 2008 Ordinance or accurately reflective of the City's actual costs of administering the billboard registration program.

> 3. In litigation, the City's retained expert's analysis was based on imprecise and arbitrary estimates and looked at the City's program as implemented, rather than as authorized by the 2008 ordinance.

Even the City's retained litigation expert did not reach a conclusion of costs anywhere near the costs determined by Mr. Cardenas, with or without the input of

his Director, Mr. Rhodes. In January of 2011, well into litigation with Reagan, the City's expert, Ms. Whitaker, performed a "point in time" analysis on which the City relied in lowering its billboard registration fee for 2013 and 2014 to $190 per billboard per year. The Whitaker Report does not support the Additional Findings of Fact and Conclusions of Law entered in this case and should have been excluded by the trial court based on Reagan's objections of relevance and unreliability. CR 246.

Ms. Whitaker data was unreliable. She based her analysis largely on Mr. Boas's estimate that he spent two hours per sign per year. She did nothing to verify that estimate (or any estimate provided), and the lack of verification as to Mr. Boas is particularly significant because his was the largest labor component to the billboard registration fee determined by Ms. Whitaker. The fee determined by Ms. Whitaker is based on five components: labor, fringe benefits, direct costs, internal costs and external costs, all of which flow from the amount of labor required. CR 247-248. Any errors made in the labor allocations have a ripple effect on the rest of the analysis and the fee. At trial, Ms. Whitaker acknowledged that a fifteen-minute variance on Mr. Boas's two-hour estimate could have a 12.5% impact on the final cost – an amount that Reagan contends is material. RR2 181:16-182:9.

Further, the Whitaker Report is not relevant. Ms. Whitaker analyzed "what it costs to administer the fee" as done by the City at a particular point in time. She

did not consider whether the employees' activities included in her assessment were reasonably necessary in light of what the 2008 Ordinance requires. CR 248. Ms. Whitaker did not know the requirements of the 2008 Ordinance, and she did not consult with anyone at the City about whether Mr. Boas's daily work was required by the 2008 Ordinance. CR 248-249. Like the analysis done by Mr. Cardenas, the Whitaker Report included requirements for legal opinions, trainee review of applications, and a Class C inspector to review everything, even though the 2008 Ordinance does not require those activities. CR 249. Additionally, the Whitaker Report's "point in time" analysis assumed that Mr. Boas's two-hour per year estimate would apply in perpetuity, but Mr. Boas himself testified that he expected that the amount of time it would take to do the work required by the 2008 Ordinance would decrease over time, as much of the initial labor went towards initial verification of the details reported by the billboard owners. RR2 130:7-131:18. The City's cost at that "point in time" is not the same as the City's actual ongoing cost of administering the billboard registration program.

4.      The evidence is insufficient to support the trial court's Additional Findings of Fact and Conclusions of Law related to the issue of whether the billboard registration fee.

The contested findings and conclusions are not supported by the evidence.

- Additional Finding of Fact #45 is vague, does not clearly identify the "registration and regulation program" to which it refers, and fails to accurately identify all of the aspects of the program as implemented

33

by the City, which exceed the requirements of the enacting ordinance. CR 541-542.

- Additional Finding of Fact #46 does not address the entirety of Ms. Whitaker's methodology and says she "calculated" the average time spent by employees, when in fact she estimated that time based on estimates provided to her by the two employees she interviewed. Double estimates are not calculations. CR 542.

- Additional Finding of Fact #47 does not acknowledge that the estimates made by Ms. Whitaker pertain to the billboard registration program as implemented by the City, regardless of whether the activities are called for by the 2008 Ordinance, and are limited to a "point in time." The Whitaker Report does not address the actual costs of the program as identified in the 2008 Ordinance, nor does it reflect the City's ongoing cost of implementation. CR 542-543.

- Additional Finding of Fact #48 does not reflect the City's ongoing cost of implementation or recognize the limitation of the Whitaker Report as a "point in time" analysis" Nothing in the record supports a finding that the cost to the City remains $193.46 now or will remain that amount in perpetuity. CR 543.

- Additional Finding of Fact #49 appears to be based on Defendants' Exhibit 2, which says that the City Council "previously found that the City's ability to enforce billboard regulations has been hampered." RR4, DE2. The exclusion of the words "previously found" suggests the City made the finding on April 5, 2012, which is not accurate. Additionally, the City did not independently determine on April 5, 2012, that the City's costs were $190 per sign per year. The City's determination was based on the Whitaker Report. Parts (B) and (E) of this Additional Finding of Fact are, therefore, inaccurate. CR 543-544.

- Additional Finding of Fact #50 does not reference the ordinance to which it refers and vaguely asserts that the City Council "relied" on the Whitaker Report without any indication of what it did as a result of that reliance. CR 544.

- Additional Finding of Fact #51 fails to acknowledge that the activities performed by the City for the billboard registration program are

34

related to the program, as implemented by the City, but they are not related to the program as called for by the 2008 Ordinance. CR 544.

- Additional Finding of Fact #52 does not specify the fee to which it refers – the $200 fee or the $190 fee. Additionally, it fails to acknowledge that the City's analysis was based on estimated costs, rather than actual costs. Further, it fails to acknowledge that the actual activities performed by the City do not all pertain to the program as outlined in the 2008 Ordinance. CR 544.

Similarly, Conclusions of Law #3, #4 and #5 are not supported by the evidence or the law. The evidence is that the City knew its fee was too high before the litigation started. The subsequent Cardenas analyses and the Whitaker Report were deficient for all the reasons stated in Part III(C)(2) above. Further, all of the analysis done by the City was an after-the-fact effort to justify its near doubling of the billboard registration fee. While the trial court concluded that the fees were reasonably necessary to the City's costs, the evidence actually showed no reasonable relationship. The fee is unreasonable and an unconstitutional tax.

D.     Case law on the assessment of a municipal fee gives the City discretion, but does not and should not allow for arbitrary fee increases and unsubstantiated after-the fact justifications.

Texas law does not allow a City to set or increase its fees arbitrarily. In *City of Houston v. Harris County Outdoor Advertising Assoc.*, City of Houston doubled the fee for an off-premise sign operating permit and was sued for charging an excessive and unconstitutional fee. 879 S.W.2d 322, 325-26 (Tex. App. – Houston [14th Dist.] 1994, writ denied), *cert. denied*, 516 U.S. 822 (1995). After a trial, the

35

court found that the fee was "unreasonably high, unconstitutionally excessive, and that $40.00 was a reasonable and constitutional fee." *Id*. at 326. The court awarded over a $1 million as damages, attorneys' fees, postjudgment interest and court costs. *Id*.

*City of Houston* notes that courts ordinarily do not interfere with a municipality's imposition of license fees under their police power, but that intervention is appropriate when the "unreasonable and oppressive nature of the exaction [is] clearly apparent from the record." *City of Houston*, 879 S.W.2d at 326. The court found the licensee had met the burden of proving unreasonableness and oppressiveness where there was no direct relationship between the fee and the receipt of services and where the revenue from the fee exceeded the reasonable costs of regulation. *Id*. at 327. The Houston court specifically rejected the City's argument that any assessment of a fee "no matter how prohibitive or tenuously connected to regulation is reasonable as long as it relates to regulation." *City of Houston*, 879 S.W.2d at 328-29. In rejecting that assertion, the Houston Court of Appeals said, "Were we to accept the City's position, any review of whether the assessment is in fact reasonably necessary to cover the cost of regulation would be prohibited. That is not the state of the law." *Id*. at 329.

The facts in *City of Houston* included the following:

(a)   The City of Houston increased the fee six times between 1980 and 1989. *Id*. at 328.

(b)   Prior to making the final increase, the City of Houston commissioned a study by an accounting firm to assist the city in assessing its administration costs. *Id*. at 328.

(c)   The commissioned study included two assessments of costs. It initially concluded that the City's costs associated with an off-premise operative permit was $19.73; then it found a higher cost after indirect department costs and costs associated with real estate signs were included, even though the City of Houston charged a separate fee for real estate signs. *Id*. at 329.

(d)   The proposal made to City Council, which was based in part on the commissioned study, "projected $184.00 in costs associated with a three-year off-premise permit and recommended a fee increase from an average of $89.50 to $179.00." *Id*. at 328.

(e)   The parties stipulated that the work directly connected to the issuance of an off-premise sign permit took about 45 minutes and included inspection, issuance of the permit and initial record keeping. *Id*. at 330.

(f)　Evidence presented included evidence that the Sign Administration organization was "characterized by waste, mismanagement and inefficiency" such that the trial court could reasonably have concluded that the fees were merely to raise revenue. *Id*. at 332.

With these facts, the trial court found the fees were not reasonably necessary to cover the cost of litigation, and the Houston Court of Appeals affirmed. *Id*. at 332.

The facts surrounding the City of Austin are, in some respects, even more egregious than those in the City of Houston case. The City of Austin nearly doubled its fee with no assessment of costs prior to the agreement – not even a basic inquiry of the employee charged with implementing the billboard registration program. The City of Austin, back in 2009, acknowledged that its fee was at least $60 too high. It conducted other internal examinations that included activities not authorized by the ordinance and activities with their own fees, which should not have been included in an assessment of costs. The only evidence in support of the City's fee is a brief study conducted by an expert after litigation was filed, and that study is largely based on an imprecise and unsupported estimate by the administrator of the billboard registration program that he spends two hours per sign per year. Aside from that study – which was defective because it looked at how the City administered the program rather than what activities are required by the enacting ordinance – there was no evidence to support the trial court's findings.

Nothing supports the conclusion that the City's fee was reasonably related to its costs or that the primary purpose of the fee was regulation, and, under *City of Houston*, it should have been found unreasonable.

  E.  The trial judge in this case deferred to the City's exercise of its discretion more than the evidence warranted.

The trial judge's letter contains two statements showing his hesitancy to interfere with the City's regulation. In addressing whether the Houston court, in *City of Houston*, had properly considered the Sign Administration department's inefficiency, waste and mismanagement, the trial judge said:

> [T]he only question for the court is the relationship of those incurred costs to the amount charged the licensee. The rest is for the electorate. Through the guise of prohibiting an unconstitutional occupation tax, the courts cannot sit in judgment of the management of a city. The constitutional prohibition does not make city councils and managers beholden to a court of law to prove their good government. [Nor are courts equipped or inclined to accept that responsibility.]

CR 385. The trial judge also criticized the Houston Court of Appeals for affirming in the absence of information as to how the trial court arrived at the $40 figure it ultimately decided was a reasonable fee:

> The appellate court left it entirely to the trial judge to pick a cost, without explanation, anywhere in that broad range. Surely a trial judge has at least as much discretion and should employ it in a manner that, if possible, avoids declaring an ordinance unconstitutional. As one court noted, mathematical precision is not required. Nor should it be lest constitutionality turn on a battle of experts estimating and crunching numbers that are inherently uncertain. No governmental entity acting in good faith should have to gamble on those terms.

CR 385.

The standard set out in *City of Houston* <u>requires</u> a trial judge to assess the purpose and reasonableness of a municipal fee, and such a judge should intervene to protect a constituency that is being unconstitutionally taxed. The court can and should sit in judgment consistent with the standard set by Texas law. When is court intervention warranted if it is not appropriate in a case such as this where a city does no analysis prior to doubling a fee, acknowledges internally that its fee is too high, and then attempts to justify a fee based on arbitrary and unverified estimates with no consideration for whether the costs incurred are relevant to the related ordinance? Reagan requests that the Court reverse the trial court on these facts and order a refund to Reagan of $198,450.00 – the amount it paid for 2009 through 2014 in excess of $115, which Mr. Granger calculated as a neutral fee. See Statement of Facts, Part 4. Alternatively, Reagan requests a refund of $116,350.00 – the amount it paid for 2009 through 2014 in excess of $140, the amount recognized even by City to be a more reasonable fee.[94]

---

[94] Reagan's damage calculation, assuming a $115.00 per-sign-per-year fee, was explained at CR 329-330. Damages assuming $140 were calculated in the same manner.

| Year | Fee | # of Signs | Amount Overcharged - $115 | Amount Overcharged - $140 |
|------|-----|-----------|---------------------------|---------------------------|
| 2009 | $200 | 389 | $33,065.00 | $23,340.00 |
| 2010 | $200 | 376 | $31,960.00 | $22,560.00 |
| 2011 | $200 | 417 | $35,445.00 | $25,020.00 |
| 2012 | $200 | 408 | $34,680.00 | $24,480.00 |
| 2013 | $190 | 425 | $31,875.00 | $21.250.00 |
| 2014 | $190 | 419 | $31,425.00 | $20,950.00 |
|  |  | TOTALS: | $198,450.00 | $116,350.00 |

IV.     Issue No. 3: Because Reagan filed this case within 60 days of the dismissal of the Federal Action becoming final, the trial court erred as a matter of law in concluding that Reagan's claims for fees paid for 2009 and 2010 are time barred.

Section 16.064 of the Texas Civil Practice & Remedies Code says the limitations period is tolled where a lawsuit is timely filed but dismissed for lack of jurisdiction and a new lawsuit in the proper court is filed within 60 days "after the date the dismissal <u>or other disposition becomes final</u>." TEX. CIV. PRAC. & REM CODE § 16.064(a)(2)(emphasis added); *See* Appendix E. Reagan's claims were timely because it filed the state court lawsuit within 60 days of the federal judgment becoming final.

A.      Section 16.064 of the Texas Civil Practice & Remedies Code and case law show Reagan was timely because it filed the second lawsuit without 60 days of the federal court losing its power to alter its judgment.

Reagan's Federal Action was filed in April of 2010. It was dismissed for lack of jurisdiction on November 30, 2011. Reagan filed this case on April 25, 2012. Judge John Dietz determined, after a summary judgment hearing, that Reagan's second lawsuit was timely:

> A motion for reconsideration could have been filed within 28 days – or by March 5, 2012. Sixty days from March 5 was May 4, 2012. The suit was filed on April 25, 2012, so it was timely under CPRC § 16.064.

CR 197-198. Judge Dietz's analysis comports with Texas law.

Texas law is clear that "a judgment of dismissal becomes final for purposes of section 16.064 when it disposes of all issues and parties in the case <u>and the court's power to alter the judgment has ended.</u>" *Oscar Renda Contracting, Inc. v. H&S Supply Co., Inc.*, 195 S.W.3d 772, 776 (Tex. App.—Waco 2006, pet. denied) (emphasis added). Texas law is clear that Section 16.064 is to be "liberally construed to effectuate its manifest objective – relief from penalty of limitation bar to one who has mistakenly brought his action in the wrong court." *See Chacon v. Andrews Distributing Co. Ltd.*, 295 S.W.3d 715, 722 (Tex. App.—Corpus Christi 2009, pet. denied); *see also Vale v. Ryan*, 809 S.W.2d 324, 327 (Tex. App.— Austin 1991, no writ)(60 day clock under Section 16.064 did not run until federal court of appeal ruled).

The federal court did not lose plenary power to alter its judgment the day the judgment was entered. CR 110. It could grant a motion for new trial under FED. R. CIV. P. 59. Under Rule 60, the federal court retained power to grant relief from a final judgment for a reasonable time, which for specific grounds is defined as up to a year after the entry of the judgment or order or the date of the proceeding. *See* FED. R. CIV. P. 60(c)(1). It also retained jurisdiction to act in various ways until an appeal was docketed or pending.[95] *See* FED. R. CIV. P. 62.1(a). Judge Dietz was

---

[95] An appeal is not due in federal court until 30 days after entry of the judgment or order. *See* FED. R. CIV. P. 4(a)(1)(A).

right – Reagan's state suit was timely because Reagan was within 60 days of the federal court losing its plenary power.

B.      The City's restrictive reading of Section 16.064 is inconsistent with Texas law.

The City contends that the current lawsuit was untimely as to claims for fees paid for 2009 and 2010 because it was filed more than 60 days after November 30, 2011 –the date the Federal Action was dismissed. SCR 9. But the 60-day period in Section 16.064 does not begin to run on the day the judgment or order denying the City's motion for new trial was entered by the federal court. In making that argument, the City relied on *Ruiz v. Austin Indep. Sch. Dist.*, 2004 WL 1171666 (Tex. App.—Austin 2004, no pet.), in which a case was dismissed because it was filed 79 days after the federal court's dismissal.

*Ruiz* did not consider the argument made by Reagan regarding the ongoing ability of the federal court to alter its judgment. Additionally, *Oscar Renda Contracting*, relied on by Reagan, better tracks the language of Section 16.064 of the Texas Civil Practice & Remedies Code in recognizing that the 60-day period does not run until the court's power to alter the judgment has ended. *Oscar Renda Contracting,* 195 S.W.3d at 776. Further, *Oscar Renda Contracting* is the more recent case. It was decided in 2006. *Ruiz* was decided two years earlier. If *Oscar Renda Contracting* is applied, Reagan's claims are not time barred.

C.	The trial judge initially rejected the City's limitations argument, but he subsequently entered a conclusion of law on the issue that was inconsistent with his stated intended ruling.

After losing the issue on summary judgment, the City raised the issue of limitations a second time through a trial brief and cited *Ruiz* once again. CR 351-52. The trial judge, in his letter of December 24, 2014, agreed with Judge Dietz and said that the limitations defense had no merit. "[W]hen dismissal by one court begins the running of a deadline to file suit in another court, it only makes sense to begin the deadline when the first court has lost plenary power." CR 383. The final judgment denying Plaintiff's claims did not address the City's limitations defense, but concluded: "All relief not expressly granted herein is hereby denied." CR 508.

Shortly after trial and before the December 24, 2014 letter, the parties submitted their proposed findings of fact and conclusions of law. Reagan requested a request for a conclusion that its claims were not barred by limitations and noted in a footnote that the issue had been decided by Judge Dietz in his order on the parties' motions for summary judgment. CR 369 #3 and fn. 2. The City asked for a conclusion that the claims were time-barred but appropriately noted in a footnote that its Conclusion of Law was included "out of an abundance of caution and to preserve the issue for appeal." CR 381 #1, fn. 2. In other words, the City recognized it had lost this argument.

Despite the prior summary judgment order, the trial court's own decision that the limitations defense did not have merit, and the parties' acknowledgment of the court's intended ruling, the trial court entered a Conclusion of Law that "Reagan's claims for fees paid in August of 2009 and March of 2010 are time barred." CR 539 #1. Reagan asked the trial court to amend its Conclusion of Law to reflect the court's previously stated determination that the claims were not time barred. CR 541. However, the trial court refused that request. CR 565, #1.

Given the federal court's ongoing ability to alter its judgment, the intended liberal construction of section 16.064, the decision by Judge Dietz, and the trial judge's own conclusions in the December 24, 2014 letter, it was error for the trial judge to enter a conclusion of law that Reagan's claims for 2009 and 2010 fees were time barred.

V.    Issue No. 4: Alternatively, the trial court erred in failing to order that Reagan was entitled, at a minimum, to a return of the amounts it paid in excess of $190 for the four years that the City charged a fee of $200 and in failing to grant attorneys' fees.

Reagan maintains that the City's billboard registration fee was an unconstitutional tax rather than a permissible fee, and that Reagan should have been awarded a reimbursement of the portion of the fees it paid that amounted to an unconstitutional tax, as well as attorneys' fees. However, even assuming that the City's expert Ms. Whitaker was correct and that a reasonable fee was $190 per billboard per year, Reagan should have been awarded a refund of a portion of the

fees it paid for 2009, 2010, 2011 and 2012, when the City was charging $200 per billboard per fee.

Although Ms. Whitaker concluded in January 2011 that a reasonable fee was $190, the City did not reduce its $200 per billboard per year fee until 2013. Reagan, therefore, paid a total of $15,900 in excess of what even the City's expert characterized as a reasonable fee. That amount was calculated as follows:

| Year | Number of Signs | Amount Overcharged |
|------|-----------------|--------------------|
| 2009 | 389 | $3890 |
| 2010 | 376 | $3760 |
| 2011 | 417 | $4170 |
| 2012 | 408 | $4080 |

The trial court erred in failing to award Reagan at least a judgment of $15,900.

The trial court also erred in failing to award Reagan attorneys' fees in the amount of $151,075.78 for the Federal Action and the present case, plus $15,000 for this appeal and another $5,000 in the event of an appeal to the Texas Supreme Court if it denies review and $10,000 if the Supreme Court grants review. CR 391, ¶¶ 7 and 8. Alternatively, the trial court erred in failing to award Reagan attorneys' fees in the amount of $69,525.28 (which are Reagan's fees for the present case alone), plus $15,000 for this appeal and another $5,000 in the event of an appeal to the Texas Supreme Court if it denies review and $10,000 if the Supreme Court grants review.

PRAYER

Reagan requests that this Court reverse the trial court and enter an order declaring that the City's billboard registration fee was an unconstitutional tax and that Reagan is entitled to a refund of $198,450.00, calculated using $115 per year as the permissible fee, (or alternatively, a refund of $116,350.00, calculated using $140 per billboard per year as the permissible fee) and attorneys' fees. Alternatively, Reagan requests that the Court reverse and order that the City refund $15,900.00 (the amount Reagan paid in excess of what even the City's expert characterized as a reasonable fee) and pay Reagan's attorneys' fees.

Respectfully submitted,

*/s/ B. Russell Horton*
B. Russell Horton
State Bar No. 10014450
rhorton@gbkh.com
George Brothers Kincaid & Horton, L.L.P.
114 West 7th Street, Suite 1100
Austin, Texas 78701
(512) 495-1400
(512) 499-0094 FACSIMILE
ATTORNEY FOR APPELLANT

47

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the word count of this document is 10,464 according to the Word Count feature in Microsoft Word.

/s/ B. Russell Horton
B. Russell Horton

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this motion was served on September 24, 2015, on the following through the court's e-filing system:

Patricia L. Link
Gray Laird
City of Austin-Law Department
PO Box 1546
Austin, TX 78767-1546
512-974-1311 (facsimile)
patricia.link@austintexas.gov

/s/ B. Russell Horton
B. Russell Horton

# APPENDIX

# APPENDIX A

Filed in The District Court
of Travis County, Texas

**MAR 31 2015**

At _____ PM.
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-12-001211

| | | |
|---|---|---|
| REAGAN NATIONAL ADVERTISING<br>OF AUSTIN, INC.<br>Plaintiff | §<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| V. | §<br>§<br>§ | TRAVIS COUNTY, TEXAS |
| CITY OF AUSTIN and MARC A. OTT,<br>in his official capacity,<br>Defendants. | §<br>§<br>§ | 200TH JUDICIAL DISTRICT |

## FINAL JUDGMENT

On the 15th day of December, 2014, all parties and their counsel appeared for a bench trial in this case. After reviewing the pleadings on file and considering the arguments, witness testimony, evidence, and authority presented, the Court renders this Final Judgment.

IT IS ORDERED, ADJUDGED, AND DECLARED that that Plaintiff's request for declaratory judgment, injunctive relief, and damages is denied and Plaintiff takes nothing. All relief not expressly granted herein is hereby denied. This judgment is final and disposes of all claims and all parties and is appealable.

SIGNED this 31st day of MARCH, 2015.



The Honorable Stephen Yelenosky
Judge Presiding

**Approved as to form only:**

_____
B. Russell Horton
Taline Manassian
GEORGE, BROTHERS, KINCAID &
HORTON, L.L.P

ATTORNEYS FOR PLAINTIFF

_____
Patricia L. Link
H. Gray Laird
Assistant City Attorneys
City of Austin Law Department

ATTORNEYS FOR DEFENDANTS

Page 1 of 1

Case # D-1-GN-12-001211

003959127

508

# APPENDIX B

CAUSE NO. D-1-GN-12-001211

| | | |
|---|---|---|
| REAGAN NATIONAL ADVERTISING INC. | § | IN THE DISTRICT COURT OF AUSTIN, |
| Plaintiff | § | |
| | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| CITY OF AUSTIN and MARC A. OTT, | § | |
| in his official capacity, | § | |
| Defendants. | § | 200TH JUDICIAL DISTRICT |

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**STIPULATED FACTS:**

1. Jurisdiction and venue is proper in this Court.

2. Reagan National Advertising of Austin, Inc. d/b/a Reagan National Advertising ("Reagan") is a Delaware corporation doing business in Austin, Travis County, Texas and surrounding areas.

3. The City of Austin, Texas, is a home-rule municipality located in Travis, Hays, and Williamson Counties.

4. Marc A. Ott is the City Manager of the City of Austin.

5. Reagan is in the business of outdoor advertising, which includes the ownership and operation of billboards. Reagan engages in outdoor advertising within the City of Austin and the surrounding area.

6. Reagan has standing to bring this suit.

7. The City of Austin regulates off-premise signs in Chapter 25-10 of the Austin City Code.

8. Off-premise signs are only allowed if they qualify as a legal non-conforming use.

9. Billboards are off-premise signs.

10. Reagan and its billboards are required to comply with Chapter 25-10 of the Austin City Code.

11. On November 8, 2007, the Austin City Council ("Council") approved Resolution No. 20071108-128 ("Resolution") related to non-conforming off-premise signs

561

(billboards). This Resolution also initiated the code amendment process for billboard regulations.

12. Before the Council amended the City's billboard regulations in June of 2008, the City Code required landowners to register billboards on their land every other year.

13. The registration fee prior to 2009 was $220 per billboard every two years.

14. Austin City Ordinance No. 20080605-076, adopted on June 5, 2008, amended the City's billboard regulations.

15. The Council adopted a registration fee of $200 per billboard per year during the annual budget process for fiscal year 2008-2009.

16. For the years 2009, 2010, 2011, and 2012, the City required billboard owners (rather than landowners) to register their billboards annually and to pay a registration fee of $200 per billboard per year.

17. On April 5, 2012, the Council adopted Ordinance No. 20120405-007, which reduced the registration fee from $200 per billboard per year to $190 per billboard per year.

18. For the years 2013 and 2014, the City required billboard owners to register their billboards annually and to pay a registration fee of $190 per billboard per year.

19. Currently, the City requires billboard owners to pay a registration fee of $190 per billboard per year.

20. The Austin Code Department is responsible for billboard registration.

21. Prior to adopting the $200 per billboard per year fee, the City did not prepare a study, budget, or survey to determine the City's cost to implement the registration program.

22. After the City had implemented the $200 per billboard per year fee, Robert Rowan did an analysis of the costs of the program and sent the November 9, 2009, email reflected in Plaintiff's Exhibit 8.

23. Plaintiff's Exhibits 10 and 11 were prepared by Daniel Cardenas, an Assistant Director of the Austin Code Department (as it existed in 2009), at the request of Willie Rhodes, Mr. Cardenas's Director at the time.

24. Mr. Rhodes asked Mr. Cardenas to analyze the cost to deliver the billboard registration program.

25. The email in Plaintiff's Exhibit 8 was sent prior to the time when Exhibits 10 and 11 were completed.

26. Exhibit 10 reflects Mr. Cardenas's first analysis of the cost to deliver the billboard registration program, which concluded a required fee of $242 per billboard per year. Exhibit 11 reflects his modified analysis after communications with Mr. Rhodes, which concluded a required fee of $352 per billboard per year.

27. When Mr. Cardenas prepared his analysis, he did not review annual budget documents (for the year the fee was amended).

28. The Budget Office, which is part of the City's Financial Services Department, is responsible for monitoring the financial performance for all City departments. It prepares the City's annual budget. Many City departments, including the Solid Waste Services Department and the Austin Code Department, employ individuals that assist the departments with budget and other financial issues.

29. Plaintiff's Exhibits 10 and 11 were prepared without the assistance of the Budget Office and were not provided to the Budget Office.

30. Plaintiff's Exhibit 11 includes the costs to develop a searchable Web presentation for a database of billboard registrations.

31. Plaintiff's Exhibits 10 and 11 do not include references to fees charged by other Texas cities for billboard registration programs.

32. Plaintiff's Exhibits 10 and 11 did not consider fees charged by other Texas cities for billboard registration programs.

33. Plaintiff's Exhibit 11 includes an item, a violation placard placement annual contract, the City did not use or purchase.

34. In April of 2010, Reagan filed a lawsuit, which was styled Civil Action No. 1:10-cv-275, Reagan Nat'l Advertising of Austin, Inc. v. City of Austin et al., in the United States District Court for the Western District of Texas, Austin Division ("Federal Action"), to challenge the constitutionality of the City's billboard registration fee.

35. On November 30, 2011, Judge Lee Yeakel issued a Final Judgment dismissing the Federal Action based on a finding that the Tax Injunction Act applied and the federal court lacked subject matter jurisdiction over the case.

36. On November 30, 2011, Judge Lee Yeakel issued Findings of Fact and Conclusions of Law in the Federal Action in connection with his Final Judgment.

37. On April 25, 2012, Reagan filed the present action.

38. In August of 2009, Reagan tendered a check in the amount of $77,800.00 as payment of the 2009 Registration Fee. This payment was made under protest and was made based on a $200 per billboard per year fee.

563

39. In March of 2010, Reagan tendered a check in the amount of $75,221.40 as payment of the 2010 Registration Fee. This payment was made under protest and was made based on a $200 per billboard per year fee.

40. In December of 2010, Reagan tendered a check in the amount of $83,400.00 as payment of the 2011 registration fee. This payment was made under protest and was made based on a $200 per billboard per year fee.

41. In December of 2011, Reagan tendered a check in the amount of $81,600.00 as payment of the 2012 registration fee. This payment was made under protest and was made based on a $200 per billboard per year fee.

42. In December of 2012, Reagan tendered a check in the amount of $80,750.00 as payment of the 2013 registration fee. This payment was made under protest and was made based on a $190 per billboard per year fee.

43. In December of 2013, Reagan tendered a check in the amount of $79,610.00 as payment of the 2014 registration fee. This payment was made under protest and was made based on a $190 per billboard per year fee.

44. Robert Rowan's spreadsheet concerning the registration program (attached to the email dated November 9, 2009 to Dan Cardenas and Matt Christianson – Plaintiff's Exhibit 8) and Dan Cardenas' spreadsheets concerning the registration program (Plaintiff's Exhibits 10 and 11) were created after the Fiscal Year 2009-2010 budget was adopted by the Austin City Council.

**ADDITIONAL FINDINGS OF FACT:**

45. Registration and regulation program consists of review of billboard records and details, inspection, enforcement, correspondence, legal assistance, financial activities, and data entry.

46. Ms. Whitaker's methodology was to determine the City's salary costs by calculating the average amount of time employees spent on activities related to the billboard registration program and then determine the overhead rates (non-salary costs) allocated by employee based on four cost factors.

47. Ms. Whitaker's study demonstrates that the billboard registration fee covers salary costs, fringe benefits (for employees), direct costs, internal indirect costs, and external indirect costs for each department involved in the billboard registration program.

48. Ms. Whitaker's study found City's cost is $193.46 per sign per year

49. On April 5, 2012, Council found that (A) the City has the authority to regulate billboards; (B) the City's ability to enforce regulations have been hampered; (C) it is necessary to require registration for effective enforcement of all current non-conforming off-

564

premises sign regulations; (D) registration information must be collected, verified, and on-site inspections should be conducted; and (E) that the City's costs are $190 per sign per year.

50. City Council relied on a "cost of service" study conducted in 2011 and the study is referenced in the ordinance.

51. The activities performed for the billboard registration program are related to the program.

52. The fee is based on the City's costs for actual activities performed.

**CONCLUSIONS OF LAW:**

1. Reagan's claims for fees paid in August of 2009 and March of 2010 are time-barred.

2. Judge Yeakel's ruling based on the Tax Injunction Act is not res judicata as to this suit.

3. There is a reasonable relationship between the amount of the fee and the City's costs.

4. The primary purpose of the fee, in light of the ordinance that authorizes the fee as a whole, is for regulation.

5. The City's fee is reasonable and constitutional.

SIGNED on May 27, 2015.

STEPHEN YELENOSKY
DISTRICT JUDGE PRESIDING

565

# APPENDIX C

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 28. Judiciary and Judicial Procedure (Refs & Annos)
    Part IV. Jurisdiction and Venue (Refs & Annos)
      Chapter 85. District Courts; Jurisdiction (Refs & Annos)

28 U.S.C.A. § 1341

§ 1341. Taxes by States

Currentness

The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

**CREDIT(S)**

(June 25, 1948, c. 646, 62 Stat. 932.)

28 U.S.C.A. § 1341, 28 USCA § 1341
Current through P.L. 114-49 approved 8-7-2015

**End of Document**                                           © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX D

Vernon's Texas Statutes and Codes Annotated
  Constitution of the State of Texas 1876 (Refs & Annos)
    Article VIII. Taxation and Revenue

Vernon's Ann.Texas Const. Art. 8, § 1

§ 1. Equality and uniformity; tax in proportion to value; income tax;
exemption of certain tangible personal property from ad valorem taxation

Effective: December 1, 2009
Currentness

Sec. 1. (a) Taxation shall be equal and uniform.

(b) All real property and tangible personal property in this State, unless exempt as required or permitted by this Constitution, whether owned by natural persons or corporations, other than municipal, shall be taxed in proportion to its value, which shall be ascertained as may be provided by law.

(c) The Legislature may provide for the taxation of intangible property and may also impose occupation taxes, both upon natural persons and upon corporations, other than municipal, doing any business in this State. Subject to the restrictions of Section 24 of this article, it may also tax incomes of both natural persons and corporations other than municipal. Persons engaged in mechanical and agricultural pursuits shall never be required to pay an occupation tax.

(d) The Legislature by general law shall exempt from ad valorem taxation household goods not held or used for the production of income and personal effects not held or used for the production of income. The Legislature by general law may exempt from ad valorem taxation:

(1) all or part of the personal property homestead of a family or single adult, "personal property homestead" meaning that personal property exempt by law from forced sale for debt;

(2) subject to Subsections (e) and (g) of this section, all other tangible personal property, except structures which are substantially affixed to real estate and are used or occupied as residential dwellings and except property held or used for the production of income;

(3) subject to Subsection (e) of this section, a leased motor vehicle that is not held primarily for the production of income by the lessee and that otherwise qualifies under general law for exemption; and

(4) one motor vehicle, as defined by general law, owned by an individual that is used in the course of the individual's occupation or profession and is also used for personal activities of the owner that do not involve the production of income.

(e) The governing body of a political subdivision may provide for the taxation of all property exempt under a law adopted under Subdivision (2) or (3) of Subsection (d) of this section and not exempt from ad valorem taxation by any other law. The

Legislature by general law may provide limitations to the application of this subsection to the taxation of vehicles exempted under the authority of Subdivision (3) of Subsection (d) of this section.

(f) The occupation tax levied by any county, city or town for any year on persons or corporations pursuing any profession or business, shall not exceed one half of the tax levied by the State for the same period on such profession or business.

(g) The Legislature may exempt from ad valorem taxation tangible personal property that is held or used for the production of income and has a taxable value of less than the minimum amount sufficient to recover the costs of the administration of the taxes on the property, as determined by or under the general law granting the exemption.

(h) The Legislature may exempt from ad valorem taxation a mineral interest that has a taxable value of less than the minimum amount sufficient to recover the costs of the administration of the taxes on the interest, as determined by or under the general law granting the exemption.

(i) Notwithstanding Subsections (a) and (b) of this section, the Legislature by general law may limit the maximum appraised value of a residence homestead for ad valorem tax purposes in a tax year to the lesser of the most recent market value of the residence homestead as determined by the appraisal entity or 110 percent, or a greater percentage, of the appraised value of the residence homestead for the preceding tax year. A limitation on appraised values authorized by this subsection:

(1) takes effect as to a residence homestead on the later of the effective date of the law imposing the limitation or January 1 of the tax year following the first tax year the owner qualifies the property for an exemption under Section 1-b of this article; and

(2) expires on January 1 of the first tax year that neither the owner of the property when the limitation took effect nor the owner's spouse or surviving spouse qualifies for an exemption under Section 1-b of this article.

(i-1) Expired.

(j) The Legislature by general law may provide for the taxation of real property that is the residence homestead of the property owner solely on the basis of the property's value as a residence homestead, regardless of whether the residential use of the property by the owner is considered to be the highest and best use of the property.

(j-1) Expired.

**Credits**
Amended Nov. 7, 1978, eff. Jan. 1, 1979; Nov. 3, 1987; Nov. 7, 1989; Aug. 10, 1991; Nov. 2, 1993; Nov. 7, 1995; Nov. 4, 1997; Nov. 2, 1999; Nov. 6, 2001, eff. Nov. 26, 2001; Sept. 13, 2003, eff. Sept. 29, 2003; Nov. 6, 2007, eff. Dec. 4, 2007; Nov. 3, 2009, eff. Dec. 1, 2009.

Vernon's Ann. Texas Const. Art. 8, § 1, TX CONST Art. 8, § 1
Current through the end of the 2015 Regular Session of the 84th Legislature

End of Document      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX E

Vernon's Texas Statutes and Codes Annotated
   Civil Practice and Remedies Code (Refs & Annos)
     Title 2. Trial, Judgment, and Appeal
       Subtitle B. Trial Matters
         Chapter 16. Limitations
           Subchapter D. Miscellaneous Provisions

V.T.C.A., Civil Practice & Remedies Code § 16.064

§ 16.064. Effect of Lack of Jurisdiction

Currentness

(a) The period between the date of filing an action in a trial court and the date of a second filing of the same action in a different court suspends the running of the applicable statute of limitations for the period if:

(1) because of lack of jurisdiction in the trial court where the action was first filed, the action is dismissed or the judgment is set aside or annulled in a direct proceeding; and

(2) not later than the 60th day after the date the dismissal or other disposition becomes final, the action is commenced in a court of proper jurisdiction.

(b) This section does not apply if the adverse party has shown in abatement that the first filing was made with intentional disregard of proper jurisdiction.

**Credits**
Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985.

V. T. C. A., Civil Practice & Remedies Code § 16.064, TX CIV PRAC & REM § 16.064
Current through the end of the 2015 Regular Session of the 84th Legislature

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX F

PLAINTIFF'S EXHIBIT NO. 2

*D-1-*    *5411*      *ALBERTALVAREZ*

# ORDINANCE NO. 20080605-076

AN ORDINANCE AMENDING CITY CODE SECTION 25-10-3 TO DEFINE MOBILE BILLBOARDS; AMENDING CITY CODE SECTION 25-10-102 TO PROHIBIT MOBILE BILLBOARDS; AMENDING CITY CODE SECTION 25-10-152 RELATING TO REQUIREMENTS FOR NON-CONFORMING SIGNS; AND ADDING A NEW CITY CODE SECTION 25-10-237 TO IMPOSE A PENALTY FOR VIOLATION OF REGISTRATION REQUIREMENTS.

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF AUSTIN:**

**PART 1.** The city council makes the following findings·

(A)　The basic purpose of mobile billboards is to display commercial advertising on public streets By their nature, mobile billboards are intended to attract the attention of citizens on public streets and adjacent right-of-way, including drivers, pedestrians, bicyclists, and others

(B)　Vehicles that display commercial advertising from a mobile platform, which can stop, start, and turn abruptly, accentuate the tendency of commercial advertising to seize attention and distract drivers and pedestrians

(C)　The use of motor vehicles to display commercial advertising creates exhaust emissions and adds to traffic congestion by placing additional motor vehicles on City streets for the sole purpose of advertising Air quality in the City of Austin metropolitan planning area has deteriorated such that the area may be categorized as a "non-attainment" area in the near future under Environmental Protection Agency regulations

(D)　For these reasons, mobile billboards create aesthetic blight and visual clutter, as well as potential and actual traffic, health, and safety hazards Prohibiting mobile billboards will promote the public health, safety and welfare of motorists, pedestrians, bicyclists and others using public streets and roadways in the City and adjoining areas, by eliminating aesthetic blight and visual clutter and potential traffic and safety hazards caused by the operation of mobile billboards A prohibition will also reduce traffic congestion and exhaust emissions by eliminating an emission source that requires and encourages continuous and extensive operation of motor vehicle engines Finally, a prohibition of mobile billboards will protect the public investment in and the character and dignity of the City's streets

COA 0018

**PART 2.** City Code Section 25-10-3 (*Definitions*) is amended to read

## § 25-10-3   DEFINITIONS.

In this chapter·

(1)   ADVERTISING SEARCHLIGHT means a searchlight used to direct beams of light upward for advertising purposes

(2)   COMMERCIAL FLAG means a piece of fabric or other flexible material displayed for commercial purposes, but excluding the official flag of a nation or of a state

(3)   FREESTANDING SIGN means a sign not attached to a building, but permanently supported by a structure extending from the ground and permanently attached to the ground

(4)   MAINTENANCE means the cleaning, painting, repairing, or replacing of defective parts of a sign in a manner that does not alter the basic copy, design, or *structure of the sign, but does not include changing the design of the sign's support* construction, changing the type of component materials, or increasing the illumination.

(5)   MOBILE BILLBOARD means a sign installed or displayed on a vehicle operating in the public right-of-way for the purpose of advertising a business or entity that is unrelated to the owner of the vehicle's primary business   The term does not include a sign that is displayed or installed on.

(a)   a non-motorized vehicle, including but not limited to pedi-cabs,

(b)   a bus that is used primarily for the purpose of transporting multiple passengers,

(c)   a taxicab, if the sign complies with the requirements of City Code Section 13-2-388, or

(d)   a vehicle operated in the normal course of the vehicle owner's business, if the sign contains advertising or identifying information directly related to the business and is not used to display advertising that is unrelated to the business

(6)   MULTI-TENANT CENTER SIGN means a sign advertising two or more uses with common facilities

COA 0019

(7)[(6)] NONCONFORMING SIGN means a sign that was lawfully installed at its current location but does not comply with the requirements of this chapter.

(8)[(7)] OFF-PREMISE SIGN means a sign advertising a business, person, activity, goods, products, or services not located on the site where the sign is installed, or that directs persons to any location not on that site

(9)[(8)] PROJECTING SIGN means a wall sign that extends over street right-of-way for a distance of more than 18 perpendicular inches from the building facade

(10)[(9)] PUBLIC RIGHT-OF-WAY means land dedicated or reserved for street right-of-way, utilities, or other public facilities

(11)[(10)] ROOF SIGN means a sign installed over or on the roof of a building

(12)[(11)] SIDEWALK SIGN means a sign located on a sidewalk, either within street right-of-way or on private property within a unified development, advertising the business abutting the sidewalk where the sign is located

(13)[(12)] STREET BANNER means a fabric sign hung over a street maintained by the City.

(14)[(13)] STREET RIGHT-OF-WAY means the entirety of a public street right-of-way, including the roadway and pedestrian way.

(15)[(14)] WALL SIGN means a sign attached to the exterior of a building or a freestanding structure with a roof but not walls

PART 3. City Code Section 25-10-102 (*Signs Prohibited in All Sign Districts*) is amended to read

§ 25-10-102 SIGNS PROHIBITED IN ALL SIGN DISTRICTS.

Unless the building official determines that the sign is a nonconforming sign, the following signs are prohibited.

(1) an off-premise sign, unless the sign is authorized by another provision of this chapter,

(2) a sign placed on a vehicle or trailer that is parked or located for the primary purpose of displaying the sign,

COA 0020

(3) a festoon, including tinsel, strings of ribbon, small commercial flags, streamers, and pinwheels,

(4) a sign not permanently affixed to a building, structure, or the ground that is designed or installed in a manner allowing the sign to be moved or relocated without any structural or support changes, excluding a sidewalk sign described in Section 25-10-153 *(Sidewalk Sign In Downtown Sign District)*:[-]

(5) a tethered, pilotless balloon or other gas-filled device used as a sign, [and]

(6) a sign that uses an intermittent or flashing light source to attract attention, excluding an electronically controlled changeable-copy sign, and[-]

(7) a mobile billboard within the City's full-purpose jurisdiction, except that a mobile billboard operator with an office located within the boundaries of the Capitol Area Metropolitan Planning Organization on the effective date of Ordinance No 20080605-076 is not subject to the prohibition until two years after the effective date of the ordinance

**PART 4.** Subsection (B) of City Code Section 25-10-152 is amended to read:

(B)     A person may not change or alter a nonconforming sign except as provided in this subsection

    (1)     The face of the sign may be changed

    (2)     The sign may be changed or altered if the change or alteration does not:

        (a)     increase the degree of the existing nonconformity,

        (b)     change the method or technology used to convey a message, or

        (c)     increase the illumination of the sign

    (3)     The sign may be relocated on a tract, if the building official determines that the relocated sign will not be hazardous, and the sign is:

        (a)     located on a tract that is partially taken by condemnation or partially conveyed under threat of condemnation, or

        (b)     moved to comply with other regulations

    (4)     [Except as provided in Subsection (B)(5), a] A nonconforming sign may be modified or replaced in the same location, if the modification or replacement reduces'

COA 0021

(a)  the sign area by at least 20 percent,

(b)  the height of the sign by at least 20 percent, or

(c)  both sign area and height of the sign by an amount which, combined,  is equal to at least 20 percent of the sign area and height

[(5)   A nonconforming off premises sign may be replaced if

(a)  each owner of a property from which a sign is to be removed or on which a sign is to be replaced agrees to the sign removal or replacement, as applicable,

(b)  each owner of a property from which a sign is to be removed designates the person who is responsible for removing the sign, and

(c)  the replacement sign

(i) does not direct illumination onto a property zoned or used for a residential use;

(ii) does not exceed the height of the sign it replaces, and

(iii) is constructed in the same location with same type of materials and construction design as the sign it replaces, and

1   the face height and width of the replacement sign are each at least 25 percent less than the face height and width of the sign being replaced, or

2   the replacement sign is not located in, or within 500 feet of, a historic sign district, its sign area is at least 25 percent smaller than the sign area of the sign it replaces, and

a   one other nonconforming off premises sign is permanently removed, the location of the sign to be removed is not included in a site plan that is pending approval, and if, before removal, the sign to be removed is

i.   located in a scenic road way sign district;

ii   located in, or within 500 feet of, a historic sign district; or

iii   of monopole construction; or

COA 0022

b        two  other  non-conforming  off-premises  signs  are permanently removed, and the location of a sign to be removed is not included in a site plan that is pending approval.]

__5__ [(6)]    The owner of a nonconforming off-premise sign may relocate the sign to another tract under these provisions if the requirements of this paragraph are met

(a)    The original location of the sign must be

(i)    in the area bounded by Highway 183 from Burnet Road to Highway 71, Highway 71 from Highway 183 to Lamar Boulevard, Lamar Boulevard from Highway 71 to 45th Street, 45th Street from Lamar Boulevard to Burnet Road, and Burnet Road from 45th Street to Highway 183, or on a tract that abuts the street right-of-way of a boundary street,

(ii)    in a scenic roadway sign district,

(iii)    within 500 feet of

1    a historic sign district, or

2    a residential structure located in a residential base zoning district, or

(iv)    within the boundaries of a registered neighborhood association that has requested removal of the sign

(b)    The sign must be permanently removed from the original tract and may not be replaced  __Any tract upon which an off-premise sign has been unlawfully replaced shall not be eligible as a site for a relocated sign__

(c)    The tract to which the sign is relocated

(i)    must be in.

1    an expressway corridor sign district, or

2    for a sign with a sign area of 300 square feet or less, an expressway corridor sign district or a commercial sign district,

(ii)    may not be on a scenic roadway;

(iii)    may not be within 500 feet of

COA 0023

1	a historic sign district, or

2	a residential structure located in a residential base zoning district, and

(iv)	if the tract is within the zoning jurisdiction, it must be zoned as a commercial or industrial base district

(d)	Sign district restrictions on sign height and face size otherwise applicable to the relocation tract do not apply to the relocated sign, but the sign height of the relocated sign may not exceed 42 feet above ground level street pavement.

(e)	A relocated sign must be permanently removed from the new location not later than 25 years after the date the relocation application is approved unless within the 25 year time period the sign owner permanently removes and does not relocate a second nonconforming off-premise sign from a location described in Paragraph (5)(a) [(6)(a)]

(f)	The council may waive or modify, with or without conditions, a requirement of Paragraph (5)(a)-(e) [(6)(a)-(e)] if the council determines that the waiver or modification is justified by the aesthetic benefit to the City.

(i)	In making the determination, the council may consider·

1	the number of nonconforming off-premises signs to be removed,

2	the characteristics of the sites from which the signs are to be removed,

3	the characteristics of the site on which the sign is to be relocated, and

4	other relevant factors

(ii)	The council shall hold a public hearing before acting on a proposed waiver or modification

(iii)	The director of the Watershed Protection and Development Review Department shall give notice of the hearing in accordance with Section 25-1-132(B) (*Notice Of Public Hearing*)

Page 7 of 10

COA 0024

(g)     A sign may not be relocated or removed under this paragraph unless the sign is registered and all registration fees are paid as required by Subsection (F)

(h)     For each non-conforming off-premise sign relocated under this section, the sign owner must install lighting that is energy efficient, as determined by Austin Energy, and meets or exceeds International Dark Sky standards for pollution reduction The lighting required under this subsection must be installed

(i)     no later than six months after the effective date of Ordinance No 20080605-076, if the sign was relocated prior to that date,

(ii)     upon installation of the relocated sign, if the relocation occurs after the effective date of Ordinance No 20080605-076, or

(iii)     for all other off-premise signs, within 36 months after the sign is registered in accordance with Subsection (F)

(i)[(h)]     An applicant must

(i)[i]     be the owner of each sign to be relocated or removed,

(ii)[ii]     file an application for sign relocation with the director [of the Watershed Protection and Development Review Department] at least 90 days before relocating the sign, and

(iii)[iii]     include with the application

1.     a statement from the owner of each tract from which the sign is to be removed agreeing to the permanent removal of the sign, or

2     a document approved by the city attorney indemnifying the city for all costs and claims arising from the sign relocation, sign removal, or permit issuance and providing that the city attorney may hire counsel for and shall direct the defense of the claims

(j)[(i)]     An applicant must relocate a sign not later than one year after the date the director of the Watershed Protection and Development Review Department approves the application.

[(j)  An application under this paragraph supersedes an application under Paragraph (5)].

COA 0025

**PART 5.** Subsection (F) of City Code Section 25-10-152 is amended to read

(F)    This subsection applies to an off-premise sign

   (1)    This paragraph prescribes registration and identification requirements

      (a)    The owner of the [property on which the] sign [is located] must register the sign every year [two years] with the director

      (b)    The sign [property] owner shall, on a form prescribed by the director, provide:

         (i)    information regarding the sign location, height, size, construction type, materials, setback from property boundaries, and illumination; and

         (ii)    the name and address of the sign owner[, if the sign is owned by a person other than the property owner]

      (c)    The sign [property] owner shall initially register the sign by August 31, 1999, or within 180 days after the date the sign becomes subject to the City's planning jurisdiction, as applicable, and shall pay a registration fee set by separate ordinance.

      (d)    A person who fails to register a sign as required by this paragraph commits an offense

      (e)    A sign owner is prohibited from relocating a sign if the sign owner is in violation of the registration requirements for any sign owned by that sign owner within the City's jurisdiction

      (f)    The sign owner shall place identifying markers on the sign as required by the director   Such markers shall include, but not be limited to, the applicable registration number and measurement points to assist in verifying the height of a sign

      (g)    A sign owner shall, in a manner prescribed by the director, provide an annual inventory of all signs owned by that sign owner, including but not limited to a description of the sign, the location of the sign, and the owner of the property on which the sign is located

      (h)    The building official shall notify the property owner of the pending expiration of a sign registration, no earlier than 90 days and no later than 30 days prior to the expiration.   The director shall provide the same notice to the sign owner if the inventory required under subsection (f) has been provided

COA 0026

(2)    The director shall mail notice of an application to repair or replace a sign not later than the 7th day after the application is filed to the

    (a)    applicant,

    (b)    neighborhood organization, and

    (c)    sign owner, if a sign owner is identified in accordance with Paragraph (1)

**PART 6.**  Article 12 of City Code Chapter 25-10 (*Sign Regulations*) is amended to add a new Section 25-10-237 to read:

### § 25-10-237      PENALTY FOR FAILURE TO REGISTER.

A person who fails to register a sign as required by section 25-10-152(F) commits an offense punishable by a fine of up to $500 per day for each day that the offense continues, and for each sign that is not registered.  A person who violates section 25-10-152(B)(6)(b) commits an offense punishable by a fine of up to $500 per day for each day the violation continues

**PART 7.**    The City Manager is directed to create and maintain an accessible online database containing information provided by sign owners as part of the billboard inventory required under Subsection 25-10-152(F) (*Nonconforming Signs*)

**PART 8.**    This ordinance takes effect on June 16, 2008

## PASSED AND APPROVED

§
§
§

_____June 5_____, 2008  §  _____

Will Wynn
Mayor

**APPROVED:** _____    **ATTEST:** _____

David Allan Smith
City Attorney

Shirley A Gentry
City Clerk

COA 0027

# APPENDIX G



THE STATE OF TEXAS §

COUNTY OF TRAVIS §

I, Jannette S. Goodall, City Clerk of the City of Austin, Texas, do hereby certify that the foregoing instrument is a true and correct copy of Ordinance No. 20120405-007 consisting of two (2) pages, and exhibits consisting of 0 pages, for a total of 2 pages, as approved by the City Council of Austin, Texas, at a Regular Meeting on the 5th day of April 2012, as on file in the Office of the City Clerk.

WITNESS my hand and official seal of the City of Austin at Austin, Texas, this 4th day of April 2013.

JANNETTE S. GOODALL
CITY CLERK
CITY OF AUSTIN, TEXAS

## ORDINANCE NO. <u>20120405-007</u>

**AN ORDINANCE AMENDING THE FISCAL YEAR 2011-2012 SCHEDULE OF FEES, FINES, AND OTHER CHARGES (ORDINANCE NO. 20110912-007) TO REDUCE THE FEE FOR BILLBOARD REGISTRATION.**

**BE IT ORDAINED BY THE CITY COUNCIL OF THE CITY OF AUSTIN:**

**PART 1.** Findings.

   (A) The City has the authority, pursuant to its police power and Chapter 216 of the Texas Local Government Code, to regulate non-conforming off-premise signs (commonly referred to as "billboards").

   (B) As reflected in Resolution No. 20071108-128, Council previously found that the City's ability to enforce billboard regulations has been hampered. In Ordinance No. 20080605-076, the Council reiterated the City's requirement to register billboards.

   (C) The Council finds that it is necessary to require registration of billboards for effective enforcement of all current non-conforming off-premise sign regulations.

   (D) The Council finds that billboard registration information must, at a minimum, be collected and verified. The Council further finds, as part of the billboard registration program, that the City should conduct on-site inspections of billboards to verify that the information provided by the registrant is accurate and up-to-date.

   (E) At this time, the Council finds that the City's costs are $190 per sign per year. This finding is based on the "cost of service" study completed in 2011 by an outside entity.

**PART 2.** The 2011-12 Fee Schedule attached as Exhibit "A" to Ordinance No. 20110912-007 is amended to reduce the "Billboard Registration Fee" to $190 for the Code Compliance Department, as follows:

|  | Approved 2010-11 | Approved 2011-12 | Change |
|---|---|---|---|
| *Code Compliance Department – General Fund* | | | |
| **Billboard Registration Fee** | $200 once a year | $<u>190</u> [200] once a year | ($10) |

**PART 3.** This ordinance takes effect on April 16, 2012.

**PASSED AND APPROVED**

§
§
§

_____ April 5 _____, 2012    _____
                                               Lee Leffingwell
                                               Mayor

APPROVED: _____        ATTEST: _____
            Karen M. Kennard                       Shirley A. Gentry
            City Attorney                           City Clerk

# APPENDIX H

§ 25-10-152 - NONCONFORMING SIGNS.

(A) A person may continue or maintain a nonconforming sign at its existing location.

(B) A person may not change or alter a nonconforming sign except as provided in this subsection.

    (1) The face of the sign may be changed.

    (2) The sign may be changed or altered if the change or alteration does not:

        (a) increase the degree of the existing nonconformity;

        (b) change the method or technology used to convey a message; or

        (c) increase the illumination of the sign.

    (3) The sign may be relocated on a tract, if the building official determines that the relocated sign will not be hazardous, and the sign is:

        (a) located on a tract that is partially taken by condemnation or partially conveyed under threat of condemnation; or

        (b) moved to comply with other regulations.

    (4) A nonconforming sign may be modified or replaced in the same location, if the modification or replacement reduces:

        (a) the sign area by at least 20 percent;

        (b) the height of the sign by at least 20 percent; or

        (c) both sign area and height of the sign by an amount which, combined, is equal to at least 20 percent of the sign area and height.

    (5) The owner of a nonconforming off-premise sign may relocate the sign to another tract under these provisions if the requirements of this paragraph are met.

        (a) The original location of the sign must be:

            (i) in the area bounded by Highway 183 from Burnet Road to Highway 71, Highway 71 from Highway 183 to Lamar Boulevard, Lamar Boulevard from Highway 71 to 45th Street, 45th Street from Lamar Boulevard to Burnet Road, and Burnet Road from 45th Street to Highway 183, or on a tract that abuts the street right-of-way of a boundary street;

            (ii) in a scenic roadway sign district;

            (iii) within 500 feet of:

                1. a historic sign district; or

                2. a residential structure located in a residential base zoning district; or

            (iv) within the boundaries of a registered neighborhood association that has requested removal of the sign.

        (b) The sign must be permanently removed from the original tract and may not be replaced. Any tract upon which an off-premise sign has been unlawfully replaced shall not be eligible as a site for a relocated sign.

        (c) The relocated sign:

            (i) must be in:

                 1. an expressway corridor sign district; or

                 2. for a sign with a sign area of 300 square feet or less, an expressway corridor sign district or a commercial sign district;

(ii) may not be on a tract located on a scenic roadway;

(iii) may not be within 500 feet of:

1. a historic sign district;

2. a residential dwelling unit;

3. a tract located in a zoning district, other than an interim rural residence (RR) or commercial highway (CH) zoning district, in which:

   a. a single-family residential use, a multi-family residential use, or a mixed use development is a permitted use; and

   b. if the tract is developed, the existing uses on that tract include at least one dwelling unit; or

4. a residential lot in a residential subdivision in the extraterritorial jurisdiction; and

(iv) if the sign is relocated within the zoning jurisdiction, it must be within a commercial or industrial base zoning district.

(d) Sign district restrictions on sign height and face size otherwise applicable to the relocation tract do not apply to the relocated sign, but the face size of the relocated sign may not exceed that of the original sign, and the sign height of the relocated sign may not exceed 42 feet above ground level street pavement.

(e) A relocated sign must be permanently removed from the new location not later than 25 years after the date the relocation application is approved unless within the 25 year time period the sign owner permanently removes and does not relocate a second nonconforming off-premise sign from a location described in Paragraph (5)(a).

(f) The council may waive or modify, with or without conditions, a requirement of Paragraph (5)(a) - (e) if the council determines that the waiver or modification is justified by the aesthetic benefit to the City.

(i) In making the determination, the council may consider:

1. the number of nonconforming off-premises signs to be removed;

2. the characteristics of the sites from which the signs are to be removed;

3. the characteristics of the site on which the sign is to be relocated; and

4. other relevant factors.

(ii) The council shall hold a public hearing before acting on a proposed waiver or modification.

(iii) The director of the Watershed Protection and Development Review Department shall give notice of the hearing in accordance with Section 25-1-132(B) (Notice Of Public Hearing).

(g) A sign may not be relocated or removed under this paragraph unless the sign is registered and all registration fees are paid as required by Subsection (F).

(h) For each non-conforming off-premise sign relocated under this section, the sign owner must install lighting that is energy efficient, as determined by Austin Energy, and meets or exceeds International Dark Sky standards for pollution reduction. The lighting required under this subsection must be installed:

(i) no later than six months after the effective date of Ordinance No. 20080605-076, if the sign was relocated prior to that date;

(ii) upon installation of the relocated sign, if the relocation occurs after the effective date of Ordinance No. 20080605-076; or

   (iii) for all other off-premise signs, within 36 months after the sign is registered in accordance with Subsection (F).

  (i) An applicant must:

   (i) be the owner of each sign to be relocated or removed;

   (ii) file an application for sign relocation with the director at least 90 days before relocating the sign; and

   (iii) include with the application:

    1. a statement from the owner of each tract from which the sign is to be removed agreeing to the permanent removal of the sign; or

    2. a document approved by the city attorney indemnifying the city for all costs and claims arising from the sign relocation, sign removal, or permit issuance and providing that the city attorney may hire counsel for and shall direct the defense of the claims.

  (j) An applicant must relocate a sign not later than one year after the date the director of the Watershed Protection and Development Review Department approves the application.

(C) This subsection applies to a nonconforming sign that is damaged by accident, natural catastrophe, or the intentional act of a person other than the sign owner or land owner.

  (1) The sign owner or land owner may repair the damaged sign if the cost of repairing the sign does not exceed 60 percent of the cost of installing a new sign of the same type in the same location. Otherwise, the sign owner or land owner shall remove the sign.

  (2) The sign owner or land owner:

   (a) must apply to the building official for a repair permit not later than the 30th day after the date of damage, and shall finish the repairs not later than the 90th day after the date the building official approves the permit application; or

   (b) shall remove the sign.

(D) This subsection applies to the replacement or relocation of a nonconforming sign under Subsections (B)(3) through (B)(5).

  (1) The sign owner or land owner may not replace or relocate the sign if it is dismantled before an application for a permit authorizing the replacement or relocation is filed.

  (2) The sign owner or land owner shall:

   (a) finish the replacement or relocation of the sign not later than the 90th day following the date of dismantling; or

   (b) remove the sign.

(E) The building official may not issue a permit for maintenance of a nonconforming sign if the maintenance cost exceeds 60 percent of the cost of installing a new sign of the same type in the same location.

(F) This subsection applies to an off-premise sign.

  (1) This paragraph prescribes registration and identification requirements.

   (a) The owner of the sign must register the sign every year with the director.

   (b) The sign owner shall, on a form prescribed by the director, provide:

    (i) information regarding the sign location, height, size, construction type, materials, setback from property boundaries, and illumination; and

    (ii) the name and address of the sign owner.

(c) The sign owner shall initially register the sign by August 31, 1999, or within 180 days after the date the sign becomes subject to the City's planning jurisdiction, as applicable, and shall pay a registration fee set by separate ordinance.

(d) A person who fails to register a sign as required by this paragraph commits an offense.

(e) A sign owner is prohibited from relocating a sign if the sign owner is in violation of the registration requirements for any sign owned by that sign owner within the City's jurisdiction.

(f) The sign owner shall place identifying markers on the sign as required by the director. Such markers shall include, but not be limited to, the applicable registration number and measurement points to assist in verifying the height of a sign.

(g) A sign owner shall, in a manner prescribed by the director, provide an annual inventory of all signs owned by that sign owner, including but not limited to a description of the sign, the location of the sign, and the owner of the property on which the sign is located.

(h) The building official shall notify the property owner of the pending expiration of a sign registration, no earlier than 90 days and no later than 30 days prior to the expiration. The director shall provide the same notice to the sign owner if the inventory required under subsection (f) has been provided.

(2) The director shall mail notice of an application to repair or replace a sign not later than the 7th day after the application is filed to the:

(a) applicant;

(b) neighborhood organization; and

(c) sign owner, if a sign owner is identified in accordance with Paragraph (1).

Source: Section 13-2-854; Ord. 990225-57; Ord. 990225-70; Ord. 010419-11; Ord. 020207-35; Ord. 031211-11; Ord. 040205-29; Ord. 20051117-041; Ord. 20080605-076; Ord. 20091217-141.

# APPENDIX I

# PLAINTIFF'S EXHIBIT NO. 8

*D-1-*    *5411*        *ALBERTALVAREZ*

## Dawn Holmes

**From:** Rowan, Robert
**Sent:** Monday, November 09, 2009 4:58 PM
**To:** Cardenas, Daniel; Christianson, Matt
**Subject:** Billboard Registration ordinance spreadsheet_1.xls
**Attachments:** Billboard Registration ordinance spreadsheet_1.xls

**Importance:** High

Based on last week's meeting in regards to the current Billboard Registration fee of $200, we were asked to review the current fee and see if we can seriously look at lowering the fee to a more reasonable fee. As a result, this can close the gap between the revenue and expenditures of running this program. Just doing a quick overview, we can lower the rate to $140, which will accomplish this goal.

There were also discussions about including a renewal fee. As of now, it doesn't seem feasible to implement a renewal fee since all billboards have not been registered at this time. It would seem best to wait until Code has verified the current inventory.

Law Department is waiting to see something this week. If you're okay with this, let's quickly proceed and submit it back to them this week. Their concern is that if we don't move quickly, there's a potential lawsuit on the horizon.

Robert



EXHIBIT 2
Boas 11-15-10
PENGAD 800-631-6989

1

| Function/purpose/responsibilities | Job Title | % | Salary & Fringes (Annual) | Contractuals & Commodities | Indirect Cost | Total Related Cost |
|---|---|---|---|---|---|---|
| Collect payments, deposit payments, maintain payment records | Accountant Associate | 15% | 53,668 | | | 8,050 |
| Inspect billboard sites for compliance | Inspector | 45% | 48,255 | | | 21,715 |
| | Inspector | 5% | 50,877 | | | 2,544 |
| | Asst. Div. Mgr. | 5% | 90,929 | | | 4,546 |
| | Division Mgr. | 5% | 104,545 | | | 5,227 |
| | Attorney Sr. | 25% | 74,355 | | | 18,589 |
| | | | | | | |
| Sub-Total | | | 422,629 | | | 60,671 |
| | | | | | | |
| Departmental indirect costs | | 7.4% | | | | 4,492 |
| City indirect costs | | 3.8% | | | | 2,334 |
| Total | | | | | | $ 67,497 |
| | | | | | | |
| | Code Compliance | | City/SWS indirect costs | | | |
| Departmental indirect rate calculation: | | | | | | |
| FY10 Support Services* | 558,087 | | 290,000 | | | |
| FY10 Total Requirements | 7,538,397 | | 7,538,397 | | | |
| % of Support Services cost to Total Requirements | 7.4% | | 3.8% | | | |
| | | | | | | |
| *Note: Less Support Services cost included in the "total related cost" calculation shown above. | | | | | | |

| Billboard Registration Revenue | | | | | | |
|---|---|---|---|---|---|---|
| Budgeted Revenue | $0 | | | | | |
| Projected Revenue | $70,000 | | | | | |
| Proposed Fee per billboard | $140.00 | | | | | |
| | $0.00 | | | | | |
| | | | | | | |
| Total Requirements | $67,497 | | | | | |
| Excess (Deficiency) of Total Revenue over Total Requirements | $2,503 | | | | | |

# APPENDIX J

# DEFENDANT'S EXHIBIT NO. 10

*D-1-*    *5411*        *ALBERTALVAREZ*

# City of Austin



# Billboard Registration Fee Study

January 21, 2011

**The PFM Group**
2600 Grand Avenue, Suite 214
Des Moines, IA 50312
(515) 243-2600 phone
(515) 243-6994 fax

Two Logan Square, Suite 1600
Philadelphia, PA 19103-2270
(215) 567-6100 phone
(215) 567-4180 fax

www.pfm.com



DEFENDANT'S
EXHIBIT
10

# Table of Contents

I. Executive Summary ........................................................................................... 3

II. Methodology ................................................................................................... 5

III. Cost of Service Analysis ................................................................................. 8

Appendix A: Detailed Productive Hours Calculation

Appendix B: Employee Names to Accompany Titles

Appendix C: Payroll data for the Departments of Law, Code Compliance and Solid Waste Services

Appendix D: Line-item budget data for the Departments of Law, Code Compliance and Solid Waste Services

Appendix E: City of Austin's Personnel Policies

Appendix F: City of Austin's FY2010 A-87 Cost Allocation Plan

Appendix G: Number of Billboards used in Analysis

Appendix H: City of Austin's Prior Internal Study for Cost of Service

Appendix I: Agreement between the City of Austin and Public Financial Management Inc. to perform the analysis and subsequent report for the cost of service of the Billboard Registration Fee.

Appendix J: Nickie Whitaker's qualifications, list of publications and prior witness testimony information

The following report has been created by Public Financial Management Inc. and is presented by Nickie Whitaker, Senior Managing Consultant.

_Nickie Whitaker_

# I. Executive Summary

## Executive Summary

The City of Austin (City) Law Department retained Public Financial Management, Inc., to conduct a cost of service study for the City's billboard registration fee. The purpose of this analysis is to determine the full cost of administering the billboard registration fee. The study includes all City departments that contribute to administering this fee. The Law Department provided leadership to the project and support in obtaining information.

An in-depth analysis of individual municipal fees/permits requires a high level of data as well as technical knowledge from staff on the processes for administering them. PFM collaborated with each department involved to ascertain the fully loaded cost of service related to fees and permits. The resulting cost of service findings are reported in Section III *Cost of Service Analysis* of the report.

Based on the results of the analysis, the cost of service for administering the billboard registration fee is $190. The City is currently charging $200 for annual billboard registration.

A cost of service analysis is based on the current fee policy and estimates the average time to administer an individual fee/permit. Over time, inflation or changes in the administration of the fee may impact the cost of service. PFM generally recommends that governments implement an inflationary adjustment to fees annually and complete a cost of service analysis once every four years. Inflation indices are commonly used to increase fees annually between comprehensive fee studies.



# II. Methodology

## Methodology

PFM implemented a proven methodology to evaluate the cost of the City's billboard registration fee. This methodology involved working closely with City staff to collect the most accurate data available and then organizing this data to calculate the cost of service. The first step was to identify and confirm details related to the fee, such as fee title, number of permits issued in a given period and the ordinances related to the fee. Subject Matter Experts (SMEs) were then identified from various departments within the City including:

- Code Compliance
- Law Department, Division of Land Use and Real Estate
- Solid Waste Services

## Cost of Service Analysis

Once the details of the fee were confirmed by City staff, PFM interviewed each of the SMEs to determine the best method for allocating employee time to each of the fees (i.e. labor allocation). Salary costs are the main indicator of total costs for providing permitting services; therefore, PFM's general methodology was to first estimate the average time spent on administering a permit. This method is called "manager's best estimate".

Time allocation was calculated by determining the number of minutes or hours spent per fee or permit issued by each employee. The percent of total time spent for each permit type was calculated by multiplying the average time per fee/permit by the number of fees/permits (units) and then dividing by the average annual number of hours worked (productive hours). In line with the City's Human Resources guidelines, productive hours were based upon the total annual number of hours to be worked in a year adjusted for vacation, personal and other types of employee leave. Productive hours are used throughout the time allocation study portion of the fee study in order to convert time submitted in minutes per unit or hours per unit into a percentage of total time for the year.

### Table I: Productive Hours

| Time | Hours |
|------|-------|
| Base Hours per Year | 2,080 |
| Holiday/Personal | -96 |
| Vacation (Weighted Average) Hours | -153 |
| Sick Leave (Average Comparable) Hours | -96 |
| **Productive Hours** | **1,735** |

It is possible to determine the direct labor costs using the percent of total time worked, salary information and the annual number of fees/permits issued. In addition to direct personnel costs, though, the City also incurs a series of other costs as a result of offering services associated with fees. Four overhead rates were created based on each department's

---

6



expenditures to account for these other costs. The 2010 City budget, the City's 2010 A-87 Cost Allocation Plan, as well as actual line item expenditures were used in order to calculate these cost factors. There are four basic cost factors to consider when determining overhead rates: fringe benefits (e.g. cost for employee benefits), other costs (e.g. computers, paper, etc.), internal indirect (e.g. division administrative time) and external indirect (e.g. central department service charges). These factors are shown in the Table below:

### Table II: Cost Factors

| Cost Factor | Description |
|---|---|
| Fringe Benefits | Employee benefits including; health, pension, FICA, etc |
| Direct Costs | Materials, contracts, and supplies for the division |
| Internal Indirect | Costs associated with the administration of the department or division, mostly constituting administrative personnel and leadership |
| External Indirect | Central services such as city-wide budget, finance or human resources; based on rates from the Cost Allocation Plan |

Each overhead rate was used to calculate the portion of non-salary costs that should be allocated by employee providing each service. A summation of the total overhead costs and the direct labor costs provided the fully loaded cost of service. An average cost, or a cost per unit, was determined by dividing the fully loaded cost by the number of units in a twelve month period. This method was used to compute the average fully loaded cost of each fee.



# III. Cost of Service Analysis

## Cost of Service Analysis

The Department of Code Compliance administers the billboard registration permit for the City. This involves review of billboard records and details, on-site inspection, post-inspection verification, and data entry.

A cost of service analysis is based on the current fee policy and estimates the average time to administer an individual fee/permit. PFM worked closely with departmental Subject Matter Experts to determine the average amount of time employees spend on each permit type in order to establish the average cost of providing a single permit. The time allocation for each department is presented in two distinct ways, the average time spent per permit and the total percent of time spent on all permits. The following tables are broken down by department and lastly by employee title.

**Table III: Average Time per Billboard Registration Permit**

| Position Title | Hours per Unit |
|---|---|
| **Code Compliance** | |
| Performance Consultant | 0.002 |
| Assistant Division Manager (Admin Support) | 0.002 |
| Assistant Code Compliance Director | 0.051 |
| Code Compliance Manager | 0.068 |
| Business Systems Analyst | 0.102 |
| Code Compliance Inspector | 0.167 |
| Assistant Division Manager (Training) | 0.171 |
| Code Inspector C | 2.000 |
| **Law Department** | |
| Assistant Senior Attorney | 0.171 |
| Attorney Senior | 0.171 |
| **Solid Waste Services** | |
| Account Associate (Financial Specialist) | 0.017 |

**Table IV: Total Percent of Time on Billboard Registration Permits**

| Position Title | Percentage of Time |
|---|---|
| **Code Compliance** | |
| Performance Consultant | 0.05% |
| Assistant Division Manager (Admin Support) | 0.05% |
| Assistant Code Compliance Director | 1.50% |
| Code Compliance Manager | 2.00% |
| Business Systems Analyst | 3.00% |
| Code Compliance Inspector | 4.88% |
| Assistant Division Manager (Training) | 5.00% |
| Code Inspector C | 58.57% |



| Position Title | Percentage of Time |
|---|---|
| **Law Department** | |
| Assistant Senior Attorney | 5.00% |
| Attorney Senior | 5.00% |
| **Solid Waste Services** | |
| Account Associate  (Financial Specialist) | 0.50% |

After determining the average time spent on each permit, the average cost per permit was determined by using salary data as well as cost loading factors. Each of the cost loading factors addresses additional costs to the City that are a direct result of offering each service. There are four basic cost loading factors to consider: fringe benefit costs, other direct costs, internal indirect costs and external indirect costs. Each cost rate may also be interpreted as the cost per $1 of salary to the division. The rates for each department are outlined in the following table:

### Table V:  Direct and Indirect Cost Rates

| Department | Fringe Benefit Rate | Direct Cost Rate | Internal Indirect Rate | External Indirect Rate |
|---|---|---|---|---|
| Code Compliance | 35.29% | 61.42% | 19.85% | 8.30% |
| Law Department | 28.07% | 7.86% | 9.86% | 7.67% |
| Solid Waste Services | 38.26% | 49.07% | 15.02% | 8.30% |

The direct labor costs for each employee were summed to determine the total direct cost for each fee. Each overhead rate was then multiplied by to the total direct labor cost to determine the total departmental costs related to the service. The total cost calculation charts are in the following table:

### Table VI:  Total Cost for Billboard Registration Fee

| Division Name | Salary Cost | Fringe Cost | Direct Cost | Internal Indirect Cost | External Indirect Cost |
|---|---|---|---|---|---|
| Code Compliance | $38,308 | $13,519 | $7,604 | $23,529 | $3,180 |
| Law Department | $7,550 | $2,119 | $744 | $593 | $579 |
| Solid Waste Services | $261 | $100 | $39 | $128 | $22 |

A summation of the total overhead costs and the total direct labor cost provide the fully loaded cost of service.  An average cost, or a cost per unit (or permit), is determined by dividing the fully loaded cost into the number of units (or permits) in a given year.  The cost difference between the current fee and the cost per unit was calculated.  The average cost per unit is: $190.



## Table VII: Fee Recommendation

| Fee Title | Current Fee | Detail | Cost Per Unit* | New Fee | Cost Change |
|---|---|---|---|---|---|
| Billboard Registration Fee | $ 200.00 | per billboard | $ 193.46 | $ 190.00 | $ (10.00) |

*The total number of units is 508, which includes known and registered billboards as of January 10, 2011.

The final recommended rate has been shown rounded: to the nearest 50 cent increment ($0.50) for fees under ten dollars; to the nearest dollar ($1.00) if the fee was under twenty-five dollars; to the nearest five dollar ($5.00) increment if the fee was less than one hundred dollars; and to the nearest ten dollar ($10.00) increment if the fee was one hundred dollars or more.

## Review of City Analysis of Billboard Registration Fee

In July 2010, the City completed an internal analysis of the costs for administering the billboard registration fee. As part of this report, PFM was asked to review and comment upon the methodology and analysis completed by the City. A cost of service analysis is based on the current fee policy and estimates the average time to administer an individual fee/permit; it is a point in time analysis. Overall, the analysis is very detailed and reflects a great deal of research. PFM noted the following key differences which could influence the calculation of the cost of service:

**Indirect Labor Costs**: PFM's methodology includes an Internal Indirect Cost rate, which addresses costs associated with the administration of the department, mostly constituting administrative personnel and leadership. Some of the internal management costs are specifically identified in the City's analysis. It is unclear if the City accounted for the general administration of the departments involved in addition to management directly associated with the fee.

**External Indirect Costs**: Any government activity requires a minimum amount of core city services to function. These core city-wide services may include budget, finance or human resources, etc. PFM refers to the cost of these city-wide services as the External Indirect Rate. For example, the calculated External Indirect Rate for the Code Compliance Department is $.08 for every $1 of salary related to the billboard registration fee. Because the City did not include these costs in their cost of service analysis, the estimated cost per unit may be understated.

**Productive Hours**: Productive hours represent the actual hours worked during a year. In line with the City's Human Resources policies, productive hours were based upon the total annual number of hours to be worked in a year adjusted for vacation, personal and other types of employee leave. PFM identified the number of annual productive hours as 1,735. Because the City used 2,080 hours in their calculation, the cost per unit may be overstated.

